1      IN THE UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF CALIFORNIA

3  DESIREE MARTINEZ,

4              Plaintiff,

5  vs.                          Sacramento, California
                                No. 1:15-CV-00683-JAM
6                               Tuesday, October 18, 2017
                                1:56 p.m.
7  KYLE PENNINGTON, et al.,

8              Defendants.
   _____/
9

10      TRANSCRIPT OF HEARING ON MOTION FOR SUMMARY JUDGMENT

11       BEFORE THE HONORABLE JOHN A. MENDEZ, DISTRICT JUDGE

12                          --oOo--

13  APPEARANCES:

14  For the Plaintiff:         Law Office of Kevin G. Little
                               P.O. Box 8656
15                             Fresno, CA  93747
                               By:  Kevin G. Little
16                                   Attorney at Law

17  For the Defendant          Ferguson, Praet & Sherman
    City of Clovis, et al.:    1631 E. 18th Street
18                             Santa Ana, CA  92705
                               By:  G. Craig Smith
19                                   Attorney at Law

20  For the Defendants Kim and Wild, Carter & Tipton
    Connie Pennington:         246 W. Shaw Avenue
21                             Fresno, CA  93704
                               By:  John William Phillip
22                                   Attorney at Law

23  Official Court Reporter:   Kacy Parker Barajas
                               CSR, RMR, CRR, CRC
24                             501 I Street
                               Sacramento, California  95814
25                             (916) 426-7640

1       (Call to order of the Court, 1:56 p.m.)

2           THE CLERK:  Calling civil 15-683, Martinez versus City

3   of Clovis, et al.

4       Counsel state their appearance, please.

5           MR. SMITH:  Good afternoon, your Honor.  Craig Smith

6   on behalf of defendants City of Clovis, Kristina Hershberger,

7   Channon High, Fred Sanders, Angela Yambupah, and City of

8   Sanger.

9           MR. PHILLIPS:  Good afternoon, your Honor.

10  John Phillips on behalf of defendants Kim Pennington and

11  Connie Pennington.

12          MR. LITTLE:  Good afternoon, your Honor.  Kevin Little

13  on behalf of the plaintiff, and I would like to state for the

14  record that the plaintiff herself is also present.

15          THE COURT:  Okay.  Have a seat.  Keep the microphones

16  in front of you.  We have a lot to discuss.

17      Let's start with the parents' motion for summary judgment

18  in this case.  There are three claims that have been brought

19  against the parents Kim and Connie Pennington.  The third

20  claim, conspiring to intimidate a state witness, the eighth

21  claim, conspiring to violate several California laws including

22  conspiracy to violate or commit battery, and then a negligence

23  claim, the ninth claim in this case.  It's a unique, somewhat

24  interesting theory, that the parents of an adult are included

25  as defendants in a domestic violence situation.  But again, at

least from the plaintiff's point of view, the facts give rise to liability under those three theories.

There were, let's see, evidentiary objections raised. Ms. Martinez in particular raised objections to -- hang on, sorry. Wrong motion. Sorry folks. Here we go. That was the other motion. Sorry. In this motion the parents asked the Court to take judicial notice of certain transcripts from the criminal proceedings. The Court can take judicial notice of the fact there were criminal proceedings. I can take judicial notice that there was and there were hearings. There was a public hearing. These are public documents. But I can't take judicial notice of any reasonably disputed fact that might be included in these documents. So the request for judicial notice, to the extent that I can take notice there were hearings, is granted, but I really can't take judicial notice of any fact that is reasonably disputed within the hearings themselves. They really don't play much of a part in the motion for summary adjudication.

All right. I want to start with the conspiracy to interfere with civil rights. Mr. Little, you bring that under 42 USC Section 1985, right?

MR. LITTLE: Yes, your Honor.

THE COURT: 1985(2). That section prescribes two types of conspiracies. It prohibits a conspiracy to deter by force, intimidation, or threat any party or witness in any

1    court of the United States from attending such court or from

2    testifying to any matter pending therein freely, fully and

3    truthfully.  I'll call that the first prong.

4         And then in the second prong 1985(2) prohibits conspiracies

5    formed for the purpose of impeding, hindering, obstructing, or

6    defeating in any manner the due course of justice in any state

7    or territory.  So it would seem to me that it's the second

8    prong that clearly applies here since all the proceedings --

9    criminal proceedings took place in the superior court.  I can't

10   remember which county you were in.

11        MR. LITTLE:  It was in Fresno County.

12        THE COURT:  Fresno, okay.  But -- and I'll tell you

13   why there was some ambiguity and confusion, but I think you may

14   have cleared it up in your opposition.  But it seemed to me

15   that although you clearly were relying on the second prong --

16        MR. LITTLE:  Yes, your Honor.

17        THE COURT:  -- your arguments dealt with the first

18   prong in a lot of ways.  You mentioned a lot about

19   intimidations, threats, the text or the e-mail from the mother

20   which I think would fall under intimidation.  And so it was

21   somewhat unclear to me, and I just want to clarify that you are

22   in fact bringing this claim only under the second prong; is

23   that a fair statement?

24        MR. LITTLE:  That is correct, your Honor.

25        THE COURT:  Okay.  And so here's the issue I have with

1  this claim.  Under the law, and the case is Portman, under a

2  1985(2) claim brought under the second prong, there has to be

3  evidence.  One of the elements is there has to be evidence of

4  a, quote, class-based animus, and I'm having a problem finding

5  any evidence that the parents conspired to intimidate

6  Ms. Martinez because of a class-based animus.  Your response in

7  your opposition, it simply mentioned the Violence Against Women

8  Act, and there again the best evidence in support of this claim

9  is obviously the text message from her right before the hearing

10  in Kyle Pennington's criminal case.  But I didn't see the

11  evidence of class-based animus.  There's an allegation.  But

12  again, tell me how you think either there's a genuine issue of

13  material fact on that specific element of this claim or what

14  the evidence is other than generally there's a Violence Against

15  Women Act that protects victims of domestic violence because

16  that's what I think is missing to allow you to go forward on

17  this claim.

18      MR. LITTLE:  Thank you, your Honor.  Your Honor, in

19  the Navarro case, in the Estate of Macias case, and some other

20  cases that have been cited to the Court, this circuit has

21  viewed domestic violence victims and the female gender as

22  roughly synonymous.  I do not want to portend to try to fit a

23  square peg into a round whole on this claim, and I do believe

24  that more fairly stated the evidence shows that Ms. Martinez

25  was a victim of the conspiracy that was hatched in June of 2013

1    because she was a victim of domestic violence and was viewed as

2    a potential witness against Mr. Pennington.  However, with --

3    because there is such a close association between -- and again

4    making reference to the Estate of Macias case, the Navarro

5    case, the Balistreri case, there's a close correlation between

6    women and victims of domestic violence.  It is our position for

7    purposes of this claim that they are in the context presented

8    to the Court essentially synonymous.  Ms. Martinez was --

9          THE COURT:  Is there any case that supported your

10   interpretation of Navarro or Estate of Macias?

11         MR. LITTLE:  Other than --

12         THE COURT:  It seems like a reach honestly to me.

13         MR. LITTLE:  Other than the dicta in those cases that

14   refers somewhat interchangeably between women and domestic

15   violence victims, no, your Honor.

16         THE COURT:  Okay.  Mr. Phillips?

17         MR. PHILLIPS:  We are prepared to submit on this, your

18   Honor.  It is a square peg in a round hole and a reach to try

19   and fit these facts into that claim when we really don't have

20   the allegations supporting the class-based animus.

21         THE COURT:  Mr. Little, anything further you want to

22   add with respect to that claim?

23         MR. LITTLE:  No, your Honor.

24         THE COURT:  Okay.  The eighth claim is a claim brought

25   against Kyle and the parents, Tim and Connie, for conspiring to

violate California Civil Code sections and in particular for

conspiring to commit battery.  She, the plaintiff, alleges and

asserts that the parents were aware of the wrongful conduct,

acted in concert and collectively and mutually intended with a

battery that clearly occurred, and the intimidation of the

plaintiff continuing to be concealed and that she was

consequently damaged.

Mr. Phillips, my concern with respect to your initial

defense with respect to this claim is that there is little or

no evidence that the parents actually knew about the domestic

violence while it was ongoing, that it's really an after the

fact.  And I have to tell you, taken in the light most

favorable to the plaintiff, I didn't find that argument to be

persuasive at all.  There is a ton of evidence that has been

put forward that creates at least an issue in my mind as to

whether the parents knew several months before their son's

ultimate arrest.  Whether they knew it was going on and they

took steps to try to convince Ms. Martinez not to file claims

against their son, they knew it was going on and implicitly as

part of this agreement permitted the battery to continue.

There's -- I mean, the text message itself is evidence

sufficient to get this to a jury.  So what am I misinterpreting

at least in taking the facts in the light most favorable to the

plaintiff such that I couldn't make a finding that these

parents were involved early on?

1    MR. PHILLIPS:  If the Court perceives that the text

2    message in and of itself would be enough to get this to the

3    jury, then I'm certainly not going to be able to unwind that

4    today.  My read on that, your Honor, has always been that it's

5    something of an innocuous statement.  You know, there's nothing

6    overt about it.  It just says, you know, hey, stick to the

7    truth.

8         THE COURT:  No.  It says a lot more than that but --

9         MR. PHILLIPS:  Well, in terms of the knowledge issue,

10   your Honor, the way that we briefed this and the way we looked

11   at it with respect to this claim really goes to the elements of

12   the conspiracy and that you can't -- you know, she really has

13   no facts to support a claim that the Penningtons knew in

14   advance and were actors and aided in support of that.  I think

15   there's ample record for the fact that they knew problems were

16   occurring, but I think the record supports a conclusion that

17   they knew of these things afterwards.  And there's nothing to

18   link them from a conspiracy analysis as actors, knowledge of

19   the plan tort combined with intent to aid in its commission.

20        There's an inference there that they were looking out for

21   the back of their son.  There's an inference that they didn't

22   want their son obviously to get in trouble.  But to infer that

23   they were actors in the aid and commission of the tort, I don't

24   think that's consistent with the evidence.  She testified that

25   she was close with the Penningtons.  Her daughter was close

1     with Mrs. Pennington.  She testified she basically never had

2     contact with Mr. Pennington.  So in my view of that evidence is

3     the fact that there's -- it's such a leap to infer that they

4     intended the tort.

5         I think there's a record for the injuries that occurred.

6     There's a clear record for that.  But there's not a record to

7     show that his parents intended and aided in the commission of

8     those injuries.  Did they know after the fact?  There's a

9     record for that.  But that to me, your Honor, does not comport

10    with a conspiracy analysis which requires intention and actual

11    aid in accomplishing the purpose of the conspiracy.

12            THE COURT:  Okay.  I understand your argument, and

13    that's the argument you'll obviously raise at trial; but I just

14    don't see any basis for a finding or making the finding that

15    you want me to make that there isn't sufficient evidence to get

16    this to the jury.

17        I assume, Mr. Little, you would not disagree with me that

18    you've put forward at least enough facts of incidents where the

19    parents came over, talked to her, tried to discourage her from

20    doing things, that the abuse continued after that, the text

21    messages, probably Exhibit 1, and that there's no reason why

22    this claim should not go forward.  Fair to assume you do not

23    disagree with the Court on that?

24            MR. LITTLE:  I do not, your Honor.

25            THE COURT:  Okay.  Anything further you want to add?

1     MR. LITTLE:  Your Honor, I think the record is very

2  strong that at least after the June 4th meeting at

3  Ms. Martinez's residence after Mr. Pennington was arrested

4  where the parents helped concoct the story and going on through

5  the end of this ordeal in September there's overwhelming

6  evidence in our estimation that the parents were involved.

7     THE COURT:  And then the third claim against the

8  parents you bring is a negligence claim, and again the problem

9  I'm having with this claim is a finding that they had a duty to

10  care.  And it's also I think fair to say, correct me if I'm

11  wrong, but the way it was pled in the complaint and your theory

12  that because they lived on the property of the parents that you

13  were entitled to bring a negligence claim and then you also

14  argued or at least alleged that I think it was the father was a

15  mandatory reporter and had a duty to report, and he didn't

16  report.  My impression is, again I want to clarify, but that

17  you've abandoned those theories, and now your only theory is

18  that because they violated certain provisions of the Penal

19  Code, that that alone allows you to go forward on a negligence

20  claim and bring a civil negligence claim against them.  So am I

21  correct that you've abandoned those other two theories?

22     MR. LITTLE:  Yes, your Honor.

23     THE COURT:  Okay.  And then the only case you cite in

24  support of your new argument, which isn't pled but it's a new

25  argument, probably would be required to amend your complaint at

1    this point if I allowed it to go forward, but is this Ramirez

2    versus Nelson case.  And I've looked at that.  I have it in

3    front of me, and factually it's obviously distinguishable.

4    There may be some language in there, I think that's why you

5    cited it, that you're relying on to try to support your new

6    theory.

7        But again I'm having a real problem with allowing that

8    claim to go forward simply because you say that the parents

9    have violated certain provisions of the Penal Code, have

10   committed criminal acts.  And simply you saying that and

11   evidence to prove that are two different things.  It also would

12   turn this trial into a second trial as to whether the

13   plaintiffs or the parents are in fact -- have created or have

14   committed criminal acts.  Not sure I want to go down that path.

15   But I just see a complete lack of evidence to support your new

16   theory, and I don't see at least any basis for saying again

17   that the parents had the type of duty, a special relationship

18   that normally is present in a pure negligence claim.  So I'll

19   allow you to respond to that, but again I don't see a legal

20   basis for allowing you to go forward with this claim,

21   especially if you're only relying on Ramirez.

22       MR. LITTLE:  Your Honor, the Penal Code citations were

23   to rebut the defendant's argument that the parents had no duty.

24   Certainly they did not have a special relationship with Desiree

25   that would imply negligence under the law.  And the way the

1    discovery turned out, they were not the owners of the property,

2    and there isn't a mandatory reporter relationship on behalf of

3    a domestic violence -- an adult domestic violence victim.

4         With respect to the Penal Code provisions, it's our

5    contention based on the Ramirez case that they do show that any

6    citizen, regardless of a special relationship, has a duty

7    toward another not to commit battery, not to dissuade them from

8    calling 911 and the like, and that is our argument.

9              THE COURT:  I understand your argument.  Again, I

10   didn't see any case that supported that, and Ramirez itself

11   doesn't support that theory.  I understand the theory, but

12   again, I think it's an expansion of some language in Ramirez

13   that just hasn't been adopted or found to be applicable in this

14   type of situation and by any other court.

15        Mr. Phillips, anything you want to add on that claim?

16             MR. PHILLIPS:  Submitted as to the negligence cause of

17   action, your Honor.

18             THE COURT:  Okay.  Then coming back to the three

19   claims, anything further either side wants to add with respect

20   to the motion for summary judgment on those three claims or

21   the -- I'm sorry, just anything you want to add with respect to

22   those three claims?

23             MR. PHILLIPS:  One very brief --

24             THE COURT:  Go ahead.

25             MR. PHILLIPS:  -- thing if I could add, your Honor.

With respect to the issue of the text message, my impression is
that the Court may believe there's enough of a record to put
the eighth cause of action forward, notwithstanding this issue
of the text message. I don't know where we're going to go on
that, but when you look at the text message, it seems to me
that that would really be more supportive of the third cause of
action, conspiracy to intimidate a safe witness. So as to the
eighth cause of action, conspiracy to commit battery, it
doesn't seem to me to support that claim, and I just wanted to
make that note.

THE COURT: Okay. And again, I think the reason it's
part and parcel of this pattern of the parents getting involved
is your first line of defense is the parents didn't know what
was going on until after the fact, and that's just another
example among many that the parents had knowledge of what was
going on including the domestic violence and the battery going
on at a very early point in this process. So I think that is
just part and parcel of all the evidence that the plaintiffs
put forward with respect to that claim.

MR. PHILLIPS: Thank you, your Honor. Understood.

THE COURT: Mr. Little, anything further you want to
add?

MR. LITTLE: No, your Honor.

THE COURT: Then the Court is prepared to rule on the
motion for summary judgment with respect to Kim and Connie

Pennington.  With respect to the motion for summary judgment on

the third claim, the Court finds as to that claim, the

conspiracy to interfere with civil rights under section 42 USC

section 1985(2), the second prong.  What is missing is

sufficient evidence to show and it is required to show that

there is a class-based animus here, that the parents did in

fact impede, hinder, obstruct or defeat the due course of

justice in any state or territory in this case and in any state

court because of a class-based animus.

Again, the only argument offered by the plaintiff is a

citation to the Violence Against Women Act, and in an expansive

reading of some case including the Estate of Macias and

Navarro, neither of which have found that simply because

domestic violence involves largely violence against women and

that obviously Ms. Martinez -- in Ms. Martinez's case, as a

woman who experienced domestic violence here, that that is

sufficient to make a finding as a matter of law that the

actions here were based or were a class-based animus type

action.

The Court disagrees.  No case has really supported that

interpretation.  And given the absence of such evidence and the

fact that it is an element of this claim, the claim would fail,

and therefore, the motion for summary judgment is granted on

that claim.

On the eighth claim, the battery conspiracy claim, as the

Court has indicated from its comments, there is more than sufficient evidence in this case to raise a genuine and triable issue of material fact as to whether as co-conspirators the parents should be held responsible. It makes no difference that the parents did not directly batter the plaintiff in this case because there is a question of whether they were co-conspirators. And if they were co-conspirators, then in effect the law would permit a jury to find that they, as co-conspirators, would incur tort liability co-equal with the immediate tortfeasor, in this case Kyle Pennington, and there again has been enough evidence offered to submit that issue and this claim to a jury to determine in fact when the parents in fact knew about the battery that was occurring and then what actions, if any, they took after that as co-conspirators if in fact there was an agreement of any type. All those are issues that would preclude summary adjudication on this claim. And in viewing the evidence in the light most favorable to Ms. Martinez, the Court will allow the eighth claim to go forward as to whether the parents along with their son conspired to batter Ms. Martinez.

And then finally on the ninth claim, the negligence claim, as the Court has indicated, the plaintiff has abandoned her premises liability negligence theory. Plaintiff has also abandoned her argument that the father, Kim Pennington, as a peace officer owed her a duty. There is no evidence and no

1    basis to allow the Court to conclude as a matter of law that

2    there is a legal duty here that was imposed on the parents upon

3    which this claim can go forward.  The Ramirez case, while

4    containing some language that is relied upon by the plaintiff,

5    does not in fact hold that under the theory put forward by

6    Ms. Martinez in this case that the plaintiff can go forward on

7    a civil negligence claim.  Again lacking an evidence of any

8    special relationship or a duty on the part of the parents, the

9    negligence claim in this case cannot go forward as a matter of

10   law, and for those reasons, the Court grants summary

11   adjudication in favor of the parent defendants on that claim.

12   So only the eighth claim with respect to the parents will go

13   forward.

14       Okay.

15       MR. PHILLIPS:  Your Honor, shall I submit an order to

16   that effect?

17       THE COURT:  You can, absolutely, if you want to just

18   run it by Mr. Little for approval as to form.

19       MR. PHILLIPS:  Understood.  Thank you.

20       THE COURT:  Okay.  On the claims brought by the

21   remaining defendants, let me take up first the evidentiary

22   objections that were raised.  Ms. Martinez objected to evidence

23   pertaining to Channon, her name is spelled C-h-a-n-n-o-n, High.

24   Ms. Martinez objects to certain evidence submitted with respect

25   to Ms. Channon's job in the Clovis Police Department,

1    particularly facts 34, 35 and 36.  Fact 34 stated that

2    Ms. Channon says she worked four ten-hour shifts.  Fact 35 said

3    that she worked from 7:00 a.m. to 5:00 p.m.  And fact 36 said

4    that she lacked direct access to calls made to the dispatch

5    center, and she knew no direct number for the public to dial.

6        Mr. Little, you claim that the information wasn't produced

7    in discovery, wasn't produced as a Rule 26 disclosure, and that

8    you never had a chance to scrutinize or depose Ms. Channon on

9    these issues.

10       Mr. Smith, I got the impression that you thought at some

11   point in the deposition they actually asked specific questions

12   pertaining to these facts.  I would think if in fact it was

13   part of a deposition, you would have cited to the deposition.

14   Did I miss something in terms of you're basically saying that

15   the plaintiff is just wrong because you don't cite to any

16   deposition testimony.  She was deposed, right?

17            MR. LITTLE:  She was, your Honor.

18            THE COURT:  Okay.  And your view is you didn't even

19   know about this.

20            MR. LITTLE:  Correct.

21            THE COURT:  Okay.  And then I look at facts 34, 35 and

22   36, and I don't see any citation to her deposition.  Wouldn't

23   that be the best evidence?  I am concerned that you didn't

24   disclose this and that the objection, at least on those three

25   facts, should be sustained.  So tell me where there is actual

1   evidence that this was properly disclosed as part of discovery

2   or as a Rule 26 disclosure because, as I look at it, I don't

3   think you've met your burden.

4           MR. SMITH:  I understand your concern, and I should

5   have cited the deposition transcript.  The complaint itself,

6   the second amended complaint, goes into the fact that since the

7   beginning of this lawsuit plaintiff has known that she worked

8   for the records department, that she was not a sworn peace

9   officer on patrol, if you will.  She was still a sworn peace

10  officer at the time, but she was working in an administration

11  position, well known to plaintiff.  She was inquired of at

12  deposition about her job, generally speaking.

13          I cite to the opposition, which is what plaintiff included

14  in his own opposition with respect to his knowledge regarding

15  Channon High, where he cites, I believe to evidence, that High

16  was working in the front office of the records division.  He

17  was aware of that.  And that also she was asked about her

18  position and her duties as a Clovis Police Department peace

19  officer at the time of the incident during the deposition.  You

20  know, basically the initial disclosures it was disclosed to him

21  she's a party in the action.  She's a peace officer for Clovis

22  Police Department.  He's aware from the second amended

23  complaint that it was an administration position.  You know,

24  the documents were provided, and the case moved forward into

25  written discovery in which any and all questions that plaintiff

1  wanted to inquire about her job duties, functions, hours, work

2  schedules, restroom breaks, whatever it may be, could have been

3  and at times were inquired of, as I stated.

4      So I also think that this is a belated discovery issue

5  brought as an objection.  There was really no omission of what

6  her position was with the Clovis Police Department.  Granted

7  the initial disclosure itself, as I don't believe is required

8  to do so, did not state that she works "X" amount of hours and

9  that she does not receive phone calls from the public.  I don't

10 believe that Rule 26 requires a defendant to go so far as to

11 set forth every single fact in which they may rely on at any

12 point in time in the litigation as long as enough facts are

13 presented to which plaintiff has the opportunity to inquire,

14 and this, Kevin I'm sure would admit, that he knew as a matter

15 of fact --

16      THE COURT:  Kevin being Mr. Little?

17      MR. SMITH:  Mr. Little, excuse me.  That in fact she

18 was a peace officer in an administrative position working in

19 records.  He knew that at the time of deposition.

20      THE COURT:  Mr. Little, you want to respond?

21      MR. LITTLE:  Your Honor, as part of discovery, I

22 always ask three interrogatories.  This was no exception.  One,

23 identify all of the facts upon which you base your denial of

24 liability.  Number 2, identify any fact that supports your

25 denial of any allegation in the complaint.  And number 3,

1    identify any fact which supports any asserted affirmative

2    defense.

3              THE COURT:  None of these facts were identified.

4              MR. LITTLE:  Correct.

5              THE COURT:  Okay.  I'm going to sustain the objection.

6    The Court will not consider facts 34 through 36 with respect to

7    this motion.  The defendants have objected to Ms. Martinez's

8    supplemental declaration as well as her expert's declarations.

9    The objections primarily are speculation, lack of foundation,

10   irrelevance, lacks personal knowledge.  With respect to these

11   objections, as I often say to lawyers in summary judgment

12   motions, the Court self-polices in terms of objections such as

13   lack of foundation, speculation, irrelevance.  So in terms of

14   those objections, I would overrule those objections.

15       What I do always find to have merit is it's always

16   interesting to me when a party submits a declaration after

17   having been deposed.  It makes little or no sense to me to try

18   to submit a declaration that supplements a deposition, and a

19   lot of times it simply contradicts the deposition.  So to the

20   extent I think any part of the declaration contradicted the

21   deposition, the Court hasn't considered it.

22       In terms of the expert declarations, I would overrule the

23   objections.  Again, I didn't find them to be improper in any

24   way.  They frankly don't carry a significant amount of weight

25   in terms of deciding the legal issues involved in these

1    motions.  But I, for purposes of the record, would overrule the

2    objections as to the experts.

3         Let's focus on the claims, and let's take up first the

4    claims against the two cities.  First claim in this case is a

5    Monell claim brought under section 1983, and again under

6    Monell, the plaintiff would have to prove that in fact under

7    section 1983 that any action pursuant to an official municipal

8    policy caused the injury in this case.  The problem I think

9    with your Monell claim, Mr. Little, is that there is a lack of

10   evidence of what normally is seen in Monell cases brought

11   against cities of a widespread problem involving in this case

12   domestic violence victims, police lack of response, a -- you

13   actually alleged that there was a consistent failure to comply

14   with domestic violence law and accepted police practices, but

15   there is clearly a lack of evidence in this case showing, other

16   than the specific incidents involving Ms. Martinez herself,

17   that there is a pattern and practice involved with respect to

18   these cities.  And there's no cases that have been cited that I

19   saw cited by the plaintiff that would support the Monell claim

20   here.

21       The Lewis case that you cite, which is a Seventh Circuit

22   case, really doesn't carry much weight.  That granted summary

23   judgment for the city because the plaintiff failed to present

24   evidence of a widespread practice with the city ignoring gender

25   discrimination and retaliation.

1     City of Canton versus Harris held inadequate police

2  training might support a Monell claim but only when the failure

3  to train amounts to deliberate indifference to the rights of

4  persons with whom the police come into contact.  And there has

5  to be again a showing more so than what was presented in this

6  case of widespread practice of deliberate indifference.

7     Clouthier versus the County of Contra Costa, and the

8  objective standard applies to failure to protect claims,

9  otherwise municipal liability would amount to respondent's

10  superior liability.

11     Price versus Sery, a Ninth Circuit case, denied summary

12  judgment where the city's interpretation, differing phrases,

13  reasonable belief and probable cause represents sort of a

14  longstanding custom or practice that can establish a Monell

15  claim.  Again, there's nothing under the facts of this case

16  that demonstrate a longstanding practice or custom that has

17  occurred here.  This is a specific case involving certain

18  individual actors, but there is no policy that I found within

19  either city that would allow the Court to conclude or allow a

20  jury to conclude that it was the policy that led to the alleged

21  constitutional violations in this case.

22     I'll let you respond, but again, I just don't see any

23  support for Monell claims in this case against Clovis and

24  Sanger.  Go ahead.

25     MR. LITTLE:  Your Honor, I'm prepared to submit on the

1    issue.

2              THE COURT:  Okay.  Anything further you want to add?

3              MR. SMITH:  I'll submit.

4              THE COURT:  Okay.  Based on those comments, the Court

5    finds that as to that claim, Ms. Martinez has not met her

6    burden.  The pattern of similar constitutional violations by

7    untrained employees is ordinarily necessary to demonstrate

8    deliberate indifference for purposes of a failure to train

9    argument.  That's the Connick case.  There is no such evidence

10   in this case.  The court does grant summary judgment as to

11   claim one.

12       The second claim, taking out Ms. High first and focusing

13   only on the Officers Hershberger, Yambupah, it's spelled

14   Y-a-m-b-u-p-a-h, and Sanders.  Just out of curiosity, Sanders

15   wasn't deposed.  Is he on disability?  Is he not -- not able to

16   participate?

17             MR. SMITH:  He has dementia, advanced, and he's in a

18   facility.

19             THE COURT:  Okay.  The issue I want to focus on is

20   qualified immunity which neither side spent a lot of time on.

21   And the reason it is of concern to the Court is because of

22   recent cases handed down by both the United States Supreme

23   Court and the Ninth Circuit, and there's been a shift, a

24   significant shift in the analysis of qualified immunity.  It

25   was raised by the defendants in this case as one of their

defenses. But the Supreme Court case of White versus Polly

causes some concern -- not concern but causes this Court to

pause and reevaluate I think the way I've look at the qualified

immunity in the past. In that case, the Supreme Court seemed

to express somewhat of an annoyance with the way that federal

courts have been assessing qualified immunity in the past. The

Supreme Court noted that in the last five years the Supreme

Court has issued a number of opinions reversing federal courts

in qualified immunity cases. The Court indicated that district

courts were applying the clearly established prong at a high

level of generality, and the Supreme Court case in White versus

Polly reminded federal judges that the clearly established law

must be particularized to the facts of the case. In White

versus Polly, the Supreme Court made an example of the Tenth

Circuit and stated that the panel majority failed to identify a

case where an officer acting under similar circumstances as the

officer in that case was held to had violated the 4th

Amendment.

        And the Ninth Circuit, since White versus Polly, has

recently issued two other opinions, Estate of Andy Lopez versus

Erick Gelhaus, a case that was decided, filed September 22nd of

this year. And then just recently Isayvea versus the

Sacramento Sheriff's Department, that was filed on October 2nd,

2017. While factually neither of the cases are similar to the

case before the Court today, there's language in both of the

1    Ninth Circuit cases that again sort of reiterate what the

2    Supreme Court said, and that is, it's almost in effect now up

3    to the district court, not necessarily the parties, but up to

4    the district court to make sure that it has identified a case

5    where it could cite that showed that, the constitutional

6    violation, the violated right was clearly established at the

7    time.

8        And so what we have to do in this case before the Court is

9    go back to the 2013.  Qualified immunity would apply unless the

10   facts construed in the -- in this case the plaintiff's favor

11   show that the officers in this case, their conduct violated a

12   federal right, and second, that the violated right was clearly

13   established at the time.  So there's two prongs that the Court

14   is required to look at.  It doesn't matter which one you take

15   up first.  And what concerns me most is in effect whether at

16   the time of these incidents there was any case or cases, any

17   law which put in effect the police officers on notice that

18   their alleged conduct violated a constitutional right of the

19   plaintiff, that that was clearly established.

20       And Mr. Little, I give you credit.  You've cited a number

21   of cases that provide sort of a general guideline, and even

22   cases outside the Ninth Circuit.  The case that was probably

23   closest to this situation was Okin versus Village of Cornwall

24   on Hudson Police Department, it's a Second Circuit case.  It

25   did involve a domestic violence victim with similar

1    allegations.  The fact pattern was much worse, not that the

2    facts here aren't egregious, but the facts there were different

3    from what's been argued here.

4        And in Okin, they actually denied the qualified immunity

5    argument of the defendant in that case under that set of facts.

6    Okin also involved, as this case does, both a due process and

7    an equal protection -- subject of a due process violation and

8    equal protection violation argument.

9        But here's where I think I come out.  While again Okin is

10   helpful in terms of a general approach to qualified immunity, a

11   general approach is no longer what district courts are required

12   to do.  In effect, we have to try to find a specific case that

13   has similar facts in which, in your case, the Court has denied

14   qualified immunity.  I have a case in the light most favorable

15   to the plaintiff in which, with respect to Hershberger, there's

16   really -- there's one incident, a May 2nd, 2013, incident.

17   With respect to Yambupah, there's one incident, a June 4th,

18   2013, incident.  With respect to Sergeant Sanders, apparently

19   he was there on June 4th and he ordered Yambupah not to arrest

20   Kyle for that one incident.  But there's no evidence that any

21   of these officers had a longstanding relationship with Kyle

22   Pennington, that they were out there more than once, that these

23   same officers kept coming out over and over again.  It's not an

24   Okin type of fact situation.

25       And so I searched high and low to try to find a case that

1    was factually similar to this one, and honestly I can't.  And

2    I'm concerned that in the absence of being able to cite to a

3    case in which I could say, as of 2013, it was clearly

4    established that what these officers did put them on notice

5    that it would be a violation of the plaintiff's constitutional

6    rights such that qualified immunity should be denied.  I don't

7    have that case.  And so other than Okin, you do cite a number

8    of other cases, and I've looked at all those.  They're frankly

9    factually distinguishable from this case.  I think, as a matter

10   of law, I have to find that Hershberger, Yambupah, and Sanders

11   are entitled to qualified immunity under these circumstances.

12        I'll let you respond.

13        MR. LITTLE:  Thank you, your Honor.  I understand

14   obviously that the inquiry for qualified immunity purposes has

15   become much more factually pointed than perhaps it was.

16   However, I think that both on the Supreme Court level and in

17   the circuit there is a valid line of authority showing that the

18   same exact violation need not to have occurred previously as

19   long as the state of the law put the officers reasonably on

20   notice that the actions that they committed would have violated

21   the constitution.  In this case, there are really, I think, for

22   each of the defendants multiple aspects of their actions, and

23   so then the question becomes secondarily, when we're talking

24   about qualified immunity, what aspect of their actions are we

25   addressing?

1    With respect to Officer Hershberger, Officer Hershberger,

2    in the light most favorable to the plaintiff, confronted a

3    situation where she was told that an individual who was abused

4    not only that day but in the past by one of her work

5    colleagues.  Of course she does not -- Officer Hershberger does

6    not admit knowing or being close friends with

7    Officer Pennington, but she still in all indicated that they

8    had been on the force together basically the entire time that

9    they had been police officers with the City of Clovis.  And she

10   indicated she found that there was no basis, clearly contrary

11   to the law if you believe the plaintiff's experts, to give

12   Ms. Martinez any assistance or any information that the law

13   required because she had reported a past incident of domestic

14   violence.  That's not what the law is.

15        THE COURT:  Let me read this and tell me what, if any,

16   you disagree with.  With respect to the May 2nd, 2013,

17   incident, Ms. Martinez had just taxied home after drinking at a

18   local bar.  Kyle Pennington was at home waiting.  Hershberger

19   responded to a welfare check, not a domestic violence call.

20   When Hershberger arrived, she did separate Ms. Martinez and

21   Kyle Pennington so she and Ms. Martinez could speak alone.

22   Ms. Martinez mentioned the Dublin incident but could not

23   remember if she also mentioned that Kyle Pennington had pushed

24   her down the stairs earlier that day so now she had an injured

25   knee.  When Hershberger told Ms. Martinez to hold on a sec so

1     she could grab her tape recorder, Ms. Martinez walked back to

2     Kyle Pennington.  Ms. Martinez did not ask Officer Hershberger

3     to arrest Kyle Pennington.  Ms. Martinez admitted to Officer

4     Hershberger that she had been drinking earlier, which

5     corroborates Ms. Hershberger's testimony that because

6     Ms. Martinez was intoxicated, Ms. Hershberger thought it best

7     to have Ms. Martinez talk to a detective the next day about the

8     Dublin incident.

9         The next day Ms. Martinez missed a call from the Clovis

10    Police Department and did not call back.  She also received a

11    call from Detective Guerra, G-u-e-r-r-a, corroborating

12    Ms. Hershberger or Officer Hershberger's deposition testimony.

13    All that accurate?

14              MR. LITTLE:  I would agree with that to some extent

15    but some extent not.  According to Ms. Martinez, there was no

16    adequate separation between her and Mr. Pennington at any time.

17    Furthermore, Ms. Martinez indicated to Officer Hershberger that

18    she had been pushed down the stairs by Kyle Pennington.  And

19    contrary to the defense argument, that did not come after a

20    break in Ms. Martinez's testimony.

21        Furthermore, with respect to the issue of walking back

22    towards Mr. Pennington, Ms. Martinez's testimony is that

23    Mr. Pennington walked toward her, not that she walked toward

24    him.  Also with respect to Detective Guerra the evidence, as

25    Ms. Martinez testified, was that Mr. Pennington by that time

1   had intimidated her, had beaten her severely after the officers

2   left and had actually prepared a script for her to follow when

3   she spoke with him.

4            THE COURT:  I understand all that.  That's on

5   Mr. Pennington though.  That's not on Officer Hershberger.

6            MR. LITTLE:  Yes.

7            THE COURT:  I mean, you would agree with that, right?

8            MR. LITTLE:  What happened overnight?

9            THE COURT:  That's completely understandable why

10  Ms. Martinez didn't call the next day and what went on that

11  night, completely understandable.  But again, you're trying to

12  hold and ask this Court to find that this officer violated your

13  client's constitutional rights.  And under these specific

14  facts, I'm having difficulty finding a case that is similar

15  enough to say based on this case this officer was on notice

16  that what she did was a clear constitutional violation.  This

17  isn't Okin.  It isn't any other case that I've found that I

18  could say in an order, say here today, there's no doubt these

19  police officers knew by not arresting him, by not separating

20  them adequately, by not advising her that she could have her

21  husband arrested, that they knew what they were doing was

22  violating her constitutional rights.  That's the issue I'm

23  having.  And again, because of these, the most recent Supreme

24  Court case and these Ninth Circuit cases, it's got to be more

25  fact specific.  I can't say that Okin put these people on

1   notice.

2           MR. LITTLE:  I understand the Court's concern.  And I

3   think again the law certainly has required a more fact-specific

4   showing for qualified immunity, but I don't think it requires

5   the same exact fact scenario.  The jury could reasonably

6   conclude in the light most favorable to the plaintiff that

7   Officer Hershberger accommodated a work colleague, a long-time

8   work colleague, and clearly contravened the -- what the

9   Violence Against Women Act and the state laws enacting it

10  required, which was to provide information to arrest, if there

11  pass a dominant aggressor finding, and to make a report, none

12  of which occurred and also to also order an emergency

13  protective order.

14          THE COURT:  Qualified immunity is a question for the

15  Court.  It's a legal issue, and so juries don't get to decide

16  qualified immunity.

17          MR. LITTLE:  Understood.

18          THE COURT:  I have to do that in the first instance.

19          MR. LITTLE:  Sure.  Understood, your Honor.  But even

20  still it has to be viewed in the light most favorable to the

21  jury.  Those -- that combination of facts certainly lends

22  support to an inference that because of the favoritism towards

23  one of her work colleagues, that Officer Hershberger did not

24  provide Ms. Martinez the services to which she was entitled and

25  that she did this despite being told that there was a very

1    serious assault three weeks before, and that there was another

2    assault that day.  And even though it might not be as severe as

3    the Okin case, it certainly is akin to it, whereby an officer

4    would have been on notice that you can't play favorites when

5    you respond to domestic violence calls.  You can't let the fact

6    that you work with one of the participants or have some

7    relationship with one of the participants influence how you

8    handle this call and leave someone in harm's way.

9              THE COURT:  And so we have a clear record, I don't

10   necessarily disagree that it's akin to it.  The issue I think

11   so it's clear is whether akin to it is now enough in light of

12   the most recent cases, and my interpretation of these most

13   recent cases is that akin to it is no longer sufficient.  You

14   have to be able to say, based on these specific facts, there is

15   a case that is on point absolutely analogous to what happened

16   here such that it's easy to say this officer obviously knew

17   about that case, obviously should have known about it, and

18   decided to ignore it, and therefore, wasn't and is not entitled

19   to qualified immunity.

20        And again, I may be reading these cases more narrowly and

21   more strictly than other judges might.  But there's this

22   pattern and this trend, and the Supreme Court clearly indicated

23   its view that we need to take a different look at qualified

24   immunity.  But I understand your argument, and I want to make

25   sure that the record was clear that I think it's an issue that

1    the Ninth's going to have to take another look at.

2           MR. LITTLE:  I understand, your Honor.  And I think

3    extrapolating out that premise, which I believe that the Court

4    believes might be the -- what's being imposed by the Supreme

5    Court, but that simply cannot be true, that there has to be

6    another case that's almost exactly the same as an incident that

7    is before the Court because then in a sense constitutional

8    rights would be put under wraps.

9           THE COURT:  You understand the flip side, and it was

10   argued in the briefs.  I'm sure Mr. Smith can make the argument

11   and has made it, but the flip side of this is you've got a

12   police officer that comes out once, doesn't know the history of

13   these individuals.  There isn't any evidence that she really is

14   close friends with Kyle Pennington.  They're on the force

15   together.  But there's not that same type of relationship that

16   you see in Okin, for example.  And under different

17   circumstances it wasn't a domestic violence call in that sense.

18   In fact the victim, Ms. Martinez, wasn't even there when the

19   police officer arrived.

20      So there's other facts that play into this that don't

21   demonstrate a history of knowledge, a history of deliberate

22   indifference by this police officer, and what you're asking is

23   for the Court to allow this to go forward to a jury and allow a

24   jury to find that a police officer committed a constitutional

25   violation for one incident that I don't know how long it took.

1    But I think that's sort of the warning that the Supreme

2  Court is giving that there has to be this consideration of this

3  counter argument rather than just holding police officers

4  liable under a general theory that they should have known

5  better.  And again, this whole fact-specific inquiry is where

6  at least I see that we're headed.  I think let me focus on

7  Yambupah and Sanders as well.

8            MR. LITTLE:  Yes, your Honor.

9            THE COURT:  Yambupah responded to again just one

10  incident a June 4th, 2013, incident.  In that case the neighbor

11  called the police.  He's with Sanger, right, City of Sanger?

12            MR. SMITH:  She is.

13            THE COURT:  She is.  I'm sorry.  And Sanders is a he.

14  The neighbor apparently witnessed troubling behavior between

15  Ms. Martinez and Kyle Pennington.  This was a domestic violence

16  call.  Ms. Martinez again admittedly had had some drinks

17  earlier that night.  She was sober when she got home.  Officer

18  Yambupah talked to Ms. Martinez only five to seven feet away.

19  Sergeant Sanders was talking to Kyle Pennington.  Sergeant

20  Sanders ordered Yambupah not to arrest Kyle and instead told

21  Yambupah to refer the incident to the district attorney's

22  office.

23    Ms. Martinez went back into the house with Kyle Pennington.

24  Before leaving, Yambupah approached Kyle Pennington to confirm

25  that he would be leaving soon.  He said he was.  But that he

came inside to change clothes. Also corroborates what Yambupah

put in her police report. Actually, the next day a search

warrant and an arrest warrant were issued, and Kyle Pennington

was arrested the next day.

Sanders, again all we know, because he wasn't deposed, is

that he ordered Yambupah not to arrest Kyle Pennington which

Yambupah apparently didn't understand why and didn't get an

explanation from him. And so I see the same situation with

respect to Yambupah and Sanders that I do with respect to

Hershberger. I can't and did not find a case which under

similar facts or closely similar facts found that by doing what

they did it would be a clear violation of Ms. Martinez's

constitutional rights. Is there some difference between them

and Hershberger that perhaps I'm missing?

MR. LITTLE: Well, yes, your Honor. And if I just may

very briefly go back to Hershberger, one of the other risks of

the rigid identical facts approach is it actually provides a

perverse incentive not for officers to learn from prior cases

but to deny facts that would square them with prior cases.

Just to give you an example, well, Hershberger now knowing what

the -- under the current qualified immunity standard has every

incentive to deny what might be true. Oh, I didn't know them.

I didn't know them. So if that one small respect makes a

difference, then she escapes liability.

The other, I think, concern so -- and I believe that the

1    Okin case is sufficiently analogous certainly to the situation

2    involving Officer Yambupah which I'll get to in a minute but

3    also involving Hershberger that it put her on notice that what

4    she was doing violated the constitution.  This is not a case

5    that was so general just saying domestic violence victims have

6    rights.  It was much more factually akin, not egregious

7    obviously, but factually akin to it that it reasonably put her

8    on notice which I think even now is all the law requires.

9         With respect to Officer Yambupah, your Honor, I don't think

10   it can be overlooked.  It's easy to minimize that situation.

11   Well, it was just one day's delay.  Officer Yambupah is a work

12   colleague of Kim Pennington who at the time worked at the

13   Sanger Police Department and had worked there for more than a

14   decade.  As Ms. Martinez says in her deposition, there was

15   a --

16             THE COURT:  You said Kim Pennington.  Did you mean

17   Kyle?

18             MR. LITTLE:  No, Kim.

19             THE COURT:  The father?

20             MR. LITTLE:  He is a reserve officer and a long-time

21   reserve officer with Sanger PD.  Officer -- in Ms. Martinez's

22   deposition she indicates that there was a recognition even

23   before she was spoken to that officer -- who Kyle Pennington

24   was, and Mr. Pennington, Kim Pennington in his deposition

25   testified again having an interest to deny the facts, but he

1   does -- he did admit to having a longstanding work relationship

2   with Sanders.

3       The -- Officer Yambupah, based on officer Sanders'

4   direction, left Ms. Martinez with someone that she thought may

5   have committed a crime as serious as attempted murder.  She

6   left him there, and she recognized, even though she told him

7   that he was promising to leave, she realized that there was no

8   lawful way that she could order him to go.  She realized that

9   what she could have done was issue an EPO or file a report or

10  arrest him.  She didn't do any of those things.

11          THE COURT:  So how does that violate your client's

12  constitutional rights?  See, that's the issue.  All these facts

13  I accept, but as a matter of law, it doesn't now rise to the

14  level of a conscious violation of a constitutional right.  Okin

15  is akin, and I know we're relying a lot on Okin, but that's not

16  enough now.  And again I know you disagree, but that's not

17  enough, that the pendulum is swinging back towards a granting

18  of qualified immunity under these cases unless the federal

19  right, what they did, whether that was clearly established.

20  And again, there's no case that says that, and Okin was a 2009

21  case.

22          MR. LITTLE:  I understand.

23          THE COURT:  But under these circumstances and these

24  facts, again you can distinguish Okin in a number of ways, and

25  so Okin doesn't help in this situation.  I can't say, which I

1    would have to say, that because of the Second Circuit's

2    decision in Okin, these officers were clearly on notice that by

3    not separating Ms. Martinez from Mr. Pennington, by not

4    arresting Mr. Pennington that night, by not advising

5    Ms. Martinez of her rights that night that they knew by acting

6    in that manner they were clearly violating an established

7    constitutional right. And then I have to cite a case. The

8    case you would want me to cite is Okin. Okin doesn't say that

9    but --

10          MR. LITTLE: And I think the officers were on notice

11   also based on Kennedy versus Ridgefield.

12          THE COURT: Right.

13          MR. LITTLE: Which is from this circuit.

14          THE COURT: You also cite Tamas too.

15          MR. LITTLE: That you cannot unlawfully refuse to

16   arrest someone and thereby create an opportunity for that

17   individual to assault someone that otherwise would not have

18   existed, and that's exactly what happened here. Kennedy is not

19   from the domestic violence context.

20          THE COURT: No. Teenager shot the parents of a girl

21   he tried to rape. Because the shooting happened after an

22   officer told the teenager's family about the rape allegations,

23   the qualified immunity was denied. The Court held, Ninth

24   Circuit, it was clearly established that state officials could

25   be held liable where they affirmatively and with deliberate

1  indifference placed an individual in danger she would not

2  otherwise have faced.  Again, the principle is what you're

3  applying.  The facts are distinguishable.  That's not this

4  case.

5          MR. LITTLE:  That is not this case, but again if we're

6  talking about notice and we're talking about similar facts and

7  it's similar in the sense that you have some -- they left

8  Ms. Martinez with a dangerous assailant that they themselves

9  believed was subject to arrest, and they left him there for no

10 legitimate reason.  In that respect, it is very similar.  And I

11 do not think that the Supreme Court has required the same exact

12 situation, in other words, that we would have to have a Kennedy

13 case, but it would have had to have been a domestic violence

14 assailant instead of an armed teenager.  I do not believe

15 that's the case.  I do not believe that that would permit any

16 growth, expansion of the law.  It would make our

17 constitution -- it would cease in many respects to be a living

18 document, and I do not believe that that's what the Supreme

19 Court precedent mandates.

20          THE COURT:  Okay.  On those three defendants,

21 Mr. Smith, do you want to add anything?

22          MR. SMITH:  Unless you're willing -- you want to

23 change your mind, I would submit, but just -- I guess just a

24 couple of salient points.  We're dealing with a substantive due

25 process violation here.  DeShaney is kind of the rule of thumb

1  principle that officers are not liable for the wrongful conduct

2  of private citizens, okay?  And then we fall under the DeShaney

3  exceptions, which the Court's created a high, high standard and

4  a high burden beyond the grossly negligent, that the officers

5  put -- they took affirmative action, participated in placing

6  the individual in a worse position than they already were in,

7  acted with deliberate indifference to the known danger.  The

8  language is -- their actions shocked the conscience.

9          THE COURT:  Right.

10         MR. SMITH:  So I mean, the substantive due process

11  violation, just the underlying violation, which I spent a lot

12  of time briefing, is lacking is what our position is.  And the

13  mere scintilla that, yes, these facts are not great, it's an

14  unfortunate circumstance, no doubt about it, that these

15  officers not only were not put on notice of a clearly

16  established federal right to which they violated, all of the

17  alleged failures arise out of state law mandates under Penal

18  Code 836 regarding information to be given to the California

19  domestic violence victims.  And plaintiff's counsel raises -- I

20  believe I heard him say that you cannot unlawfully not arrest

21  somebody.  I don't see any authority where there was an actual

22  federal right that mandated an arrest under these

23  circumstances.

24      So to start with, it's not necessarily that -- I see the

25  Court, the United States Supreme Court, has clearly sent the

1   message that there's particularized facts that must be

2   contained within case law or a statute that put the officers on

3   notice, and that's the law.  That's what the constitution

4   mandates.  But not only that, that in this circumstance, there

5   is not even a substantive due process violation because there

6   was no affirmative action on the part of these police officers

7   with respect to federal rights that required them to take the

8   action, which is really omissions, that plaintiff contends that

9   they had to do which would have been to make an arrest, they

10   didn't make an arrest, provide domestic violence information,

11   California domestic violence information, which was not

12   provided and also this separation which is ambiguous at best as

13   to what the required separation is.  And so --

14   THE COURT:  And the June 4th incident, he actually was

15   arrested the next day, right?

16   MR. SMITH:  Correct.  And investigation was forwarded

17   to a detective within 24 hours for follow-up with respect to

18   Kristina Hershberger.  So these officers went out, conducted an

19   investigation, documented the incident, June 4th incident.

20   Photographs were taken.  Police report was prepared.

21   Detectives eventually issued a search and arrest warrant and

22   effectuated the arrest.  It's not the akin situation whatsoever

23   where camaraderie is shown to the suspect and communicated that

24   he could commit these acts of violence with impunity of the law

25   and contempt for the victim which is -- shocks the conscience.

1    So I see where the Court there and I think that they were

2    probably reaching at that time to find there was no qualified

3    immunity.  They found another case that didn't deal with

4    domestic violence before all these new cases with respect to

5    the United States Supreme Court, White versus Polly standard

6    from the Ninth Circuit, where they said, okay, if you basically

7    show such impunity to a suspect that he could violate the law

8    without suffering the consequences, that you're on notice that

9    that's going to be a substantive due process violation.

10        In this situation, I submit that the undisputed material

11   facts don't even arise to the level of a substantive due

12   process violation to begin with under the high standard

13   exceptions of DeShaney, but in the event that the Court

14   disagrees, there was no notice given to these officers that

15   they had a duty under federal law to make an arrest when they

16   determine who is the dominant aggressor or that they have to

17   comply with state law in giving domestic violence pamphlet

18   information or separating from a certain amount of distance the

19   victim from the suspect.  And so I think they're absolutely

20   afforded qualified immunity.

21        THE COURT:  Okay.  I'm going to give the court

22   reporter a break.  We'll come back and talk about Ms. High and

23   the claims against her, but let's come back in about ten

24   minutes so the court reporter can have a break.

25        MR. LITTLE:  Thank you, your Honor.

1          (Recess taken.)

2          THE COURT:  Okay.  Back on the record.  Let's talk

3    about the claim against Ms. High.  In terms of the not acting

4    under color of law argument, I don't want to spend a lot of

5    time on that.  I think there's at least a triable issue of fact

6    as to whether she was acting under color of state law because

7    again I'm not accepting certain facts that weren't initially

8    disclosed, and I think I need to and a jury would need to hear

9    the evidence of exactly what her position was, what she did,

10   and how she did it.  From what I recall, her answers at

11   deposition, you asked her about a phone call made on a certain

12   date at 6:00 a.m. and a phone call made on another date at 3:00

13   in the morning, right?

14         MR. LITTLE:  Yes, your Honor.

15         THE COURT:  And her answers were basically I can't

16   remember --

17         MR. LITTLE:  Right.

18         THE COURT:  -- why I was calling him or why he was

19   calling me or what we discussed.

20         MR. LITTLE:  And also she couldn't think of any reason

21   why she would speak to him at that quote, unquote, ungodly

22   hour.

23         THE COURT:  You didn't get into it in the briefs, but

24   it's something I wondered if it would be argued at trial is is

25   there something implicit in those answers in the fact that

1  there were phone calls at 3:00 a.m. and 6:30 a.m., which isn't

2  actually -- if you accept -- I'm not accepting the fact, but if

3  I actually believed she worked from 7:00 to 5:30, she probably

4  was or may have been at work at 6:30.  But anyway, setting that

5  aside, was there a relationship of some type between

6  Kyle Pennington and this woman?

7            MR. LITTLE:  Of a romantic nature?

8            THE COURT:  Yeah.

9            MR. LITTLE:  No.

10           THE COURT:  There's no allegation like that at all?

11           MR. LITTLE:  No.  I believe Mr. Pennington was asked

12  that specifically in his deposition and denied it.

13           THE COURT:  Okay.  And you have no other evidence of

14  that?

15           MR. LITTLE:  Correct.

16           THE COURT:  But you do believe she clearly gave him

17  information that Ms. Martinez had filed or was about to file

18  complaints against Kyle.  One being a conversation that was on

19  a speakerphone, correct?

20           MR. LITTLE:  Yes, your Honor.

21           THE COURT:  And then what other evidence is there that

22  you believe that she was transmitting this information?

23           MR. LITTLE:  That Mr. -- according to Ms. Martinez's

24  testimony, Mr. Pennington told her as much.

25           THE COURT:  Okay.  She denies that, correct?

1          MR. LITTLE:  Officer High denies that.

2          THE COURT:  Yeah.  Which in effect crates a genuine

3    issue of material fact.  So then the question comes to

4    qualified immunity.  Is she entitled to qualified immunity?

5    Let's assume that I think that if I take the facts in the light

6    most favorable to Ms. Martinez, the first issue the Court has

7    to decide in looking at qualified immunity is was there a

8    constitutional violation.  I think there's at least an argument

9    that disclosing private information concerning a domestic

10   violence complaint would in effect be a due process violation.

11        So then the second part is what we've talked about with the

12   other officers, was this a clearly established federal right

13   that this type of information should not have been disclosed to

14   Kyle Pennington.  In this case, and this is really more

15   Mr. Smith you can respond, I think if I accept the facts that

16   what she did is true, that she in effect was telling the

17   individual who was the perpetrator in this case that the victim

18   is making reports against you, is about to make reports against

19   you, that that is something that she should have known would be

20   a clear violation of someone's constitutional rights, a

21   violation of the substantive due process.

22        And I think it's different from what the other three

23   officers did and that under these facts if they're taken as

24   true, which I have to for summary judgment, she wouldn't be

25   entitled to qualified immunity if in fact the plaintiffs can

1    prove that that's exactly what she did, she disclosed

2    information that clearly should have not been disclosed that

3    was confidential and then placed in this case Ms. Martinez in

4    much greater danger than she would have otherwise have been.

5        Tell me why you disagree.

6        MR. SMITH:  Okay.  For starters, just so the record's

7    clear, the McDade case where an individual accessed a database,

8    either she was doing it in her official capacity or she

9    purported to be doing it in her official capacity or pretended

10   to do it in her official capacity obtained information about

11   somebody in a domestic violence shelter for the purposes of

12   having that person served.  Indeed that person was served.  It

13   caused a lot of problems for that individual victim.

14        THE COURT:  Right.

15        MR. SMITH:  The Court analysis there was essentially

16   that, okay, here you've acted under color of law because you

17   did something in your official capacity.  Whether or not what

18   you were doing in your official capacity was an exercise of

19   your legal duties, you were in your course and scope of duties

20   is irrelevant.  It's whether or not you acted in your official

21   capacity purported or pretended to.  The record is just

22   absolutely devoid of any evidence whatsoever that Channon High

23   did anything in her official capacity.  Plaintiff is requesting

24   this Court speculate and assume that because she was a police

25   officer that she therefore obtained reporting information

1    because all the evidence is is that she communicated to

2    Kyle Pennington that Desiree Martinez had made a report.  This

3    was in September of 2013, well after the criminal proceedings

4    had been under way.

5        It's just as safe to assume and speculate that Channon High

6    has friends at the district attorney's office, that she has

7    friends from other agencies in which this report could have

8    been obtained from.  There is just absolutely no evidence after

9    the close of discovery that Channon High did anything in her

10   capacity as a Clovis police officer with the City of Clovis,

11   that she pretended to, that she purported to, that she actually

12   did something to obtain confidential victim information of some

13   sort, a police report or whatever it is that was allegedly

14   communicated to Kyle Pennington in September of 2013.

15           THE COURT:  Stop there because I actually didn't focus

16   so much on the date.  So let me come back to you, Mr. Little.

17   By September 3rd, 2013, Kyle Pennington had been arrested

18   correct?

19           MR. LITTLE:  Yes.

20           THE COURT:  Criminal charges had been brought against

21   him and in fact hearings had started on the criminal charges.

22   All accurate?

23           MR. LITTLE:  Correct.

24           THE COURT:  So let's assume that Ms. High did in fact

25   transmit this information to Mr. Pennington.  If he's already

1    charged, if he's already been arrested, if he's already facing

2    charges, how does that create a -- how is that then a

3    state-created danger?  I assume at that point Ms. Martinez

4    already had a restraining order, although the restraining

5    orders didn't seem to carry much weight with Mr. Pennington.

6    So just in terms of the timing, in September of 2013, how did

7    that create a danger because it's got -- you have a

8    state-created danger argument.

9                MR. LITTLE:  Yes.

10               THE COURT:  Where is the danger?

11               MR. LITTLE:  Mr. Pennington at that point in time --

12   well, first of all, Ms. Martinez was still living with

13   Mr. Pennington.  Second --

14               THE COURT:  Still living with him while he was going

15   through the criminal proceedings?

16               MR. LITTLE:  Correct.

17               THE COURT:  Wow.

18               MR. LITTLE:  Second, Mr. -- Ms. Martinez had contacted

19   the Clovis Police confidentially to make reports of ongoing

20   threats and intimidation, and the evidence in this case shows

21   that Mr. Pennington and his family at this point were actively

22   intimidating, lobbying, persuading Ms. Martinez not to testify

23   in the criminal proceedings.  Mr. Pennington, as a result of

24   these calls, found out that Ms. Martinez was not under his

25   control as he had believed and --

1          THE COURT:  Was there another incident then?

2          MR. LITTLE:  And there was another incident.

3          THE COURT:  There were two other incidents in

4    September?

5          MR. LITTLE:  Yes, your Honor.

6          THE COURT:  All right.  Go ahead, Mr. Smith.

7          MR. SMITH:  Well, the record before the Court, that's

8    not what it says.  And so --

9          THE COURT:  What do you mean?

10         MR. SMITH:  The evidence that's before the Court,

11   there's a lot of supplemental information there.  What I mean

12   by that is there's this allegation that she was contacting

13   Clovis Police Department confidentially during September and

14   that the inference to be drawn is that that was what

15   Channon High was reporting back to Kyle Pennington that created

16   the state danger of essentially, look, if you call the police,

17   I'll teach you to call the police.

18         THE COURT:  Right.

19         MR. SMITH:  Let's just cut to the chase.  That's

20   essentially what the argument is is that that ratcheted up the

21   danger because --

22         THE COURT:  Well, that's what happened right?  That's

23   exactly what happened.  There were at least two other incidents

24   of domestic violence of abuse after September 7th.

25         MR. SMITH:  Where is correlation in timing?  You're

1  saying afterwards that that's exactly what happened.  The

2  problem -- the problem that I'm getting at is the absolute lack

3  of evidence and ambiguity in what it was that supposedly

4  Channon High discussed with Kyle Pennington in relation to

5  reports to Clovis Police Department.  When were these reports

6  made that she was disclosing?  All that we could tell from the

7  record, if taken as true, is that some report was communicated

8  that there was a report that Desiree Martinez made that was

9  communicated to Kyle Pennington.

10            THE COURT:  Right.

11            MR. SMITH:  It's unclear whether or not that was a

12  report to Sanger Police Department.  Was that a report to the

13  Clovis Police Department?  Was that a report to -- there was

14  also sheriffs of Fresno County that got involved in this case.

15  While it's not in the record, it's true.  What reports are we

16  talking about?  To what agencies?  Channon High denies this

17  outright.  But taking it to be true, what other relationship

18  did she have as a peace officer where she would have retained

19  this information?  The fundamental lack of evidence that she

20  acted in the course of her duties -- not the course and scope

21  but purported to, pretended to, or acted as a Clovis Police

22  Department police officer in obtaining this confidential

23  information and then sharing it with Kyle Pennington is missing

24  from the record.  There is no evidence that this Court could

25  rely upon that Channon High acted under color of law --

1          THE COURT:  I can't rely on Ms. Martinez's testimony,

2     is that what you're saying, the speakerphone conversation?

3          MR. SMITH:  Absolutely not.  Because what did

4     Ms. Martinez testify to?  She testified to, as far as my

5     recollection of the record -- and Mr. Little correct me if I'm

6     wrong -- is that she heard Channon High say, yes, she has made

7     a report.  So Kyle -- essentially what it is is that

8     Kyle Pennington asked her did -- is Desiree making reports, and

9     she said, yes, she made a report.  I'm looking at one right

10    now.

11         THE COURT:  Okay.

12         MR. SMITH:  I believe that that's about what the

13    testimony is.

14         THE COURT:  That's not enough to at least get it to a

15    jury?

16         MR. SMITH:  No.  Because there's no correlation

17    between that.  There's no evidence there to draw a reasonable

18    inference that the reports that she -- the report that she

19    communicated was obtained through the City of Clovis, Clovis

20    Police Department.

21         THE COURT:  Isn't the inference in looking at the

22    report -- she works for the Clovis Police Department, right?  I

23    mean, you can't draw the inference that it's a Sanger report,

24    but it's a reasonable inference to draw, at least from

25    plaintiff's point of view, that that is a Clovis confidential

1   police report.  She's there in the Clovis Police Department.

2   Whether you agree with that inference or not again are the

3   arguments you're making.  But in the light most favorable to

4   the plaintiff, that's not an unreasonable inference to draw.

5   Then how long after September 7th was the incident?

6         MR. LITTLE:  There was one incident on September 7th

7   itself and then there was another incident on the 18th.

8         THE COURT:  You can argue there's no correlation or

9   you can't draw a correlation, and he can argue absolutely

10  there's a correlation there, she's responsible for it, and ask

11  the jury to find liability.  You obviously have a number of

12  arguments.  I'm not disagreeing with you, but those are

13  arguments that I can't decide as a matter of law.  They haven't

14  made a sufficient case out against her based on the evidence

15  that's been presented.  That's something the jury's got to

16  decide.  I've got to hear it too.

17     Credibility is an issue as well.  And when there's witness

18  credibility issues, that clearly is an issue that has to go to

19  the jury.  I don't know if Ms. High is completely credible or

20  not.  I know you believe she is, and I know that will be your

21  argument to the jury.  But I'm sure that the -- there's an

22  issue of her credibility.  There's an issue of Ms. Martinez's

23  credibility as well with respect to these conversations.

24     So all those would cut against this Court finding and

25  granting summary judgment other than this issue, coming back to

1   the issue of qualified immunity, and you've raised a qualified

2   immunity argument on her behalf.  In the notice of errata you

3   argued in 2013 there was no clearly established law that

4   disclosure of confidential domestic violence information,

5   report to police department to a victim suspect is a violation

6   of the United States Constitution, whether it be a substantive

7   due process violation or equal protection violation, and

8   therefore, Channon High is entitled qualified immunity and

9   request the Court grant her such immunity.  Anything further

10  you want to add to that?

11          MR. SMITH:  Yes.

12          THE COURT:  Go ahead.

13          MR. SMITH:  Well, it's unclear from the record whether

14  this report -- and I understand drawing reasonable

15  inferences -- was confidential domestic violence report or

16  whether she breached some sort of privilege that the bottom

17  line is is that a mere scintilla of evidence isn't enough to

18  get plaintiff past the burden of summary judgment.

19      And the scintilla of evidence here is that she communicated

20  that there was a report that she was looking at of some sort.

21  So with respect to the qualified immunity argument, I don't

22  know what clearly established law would mandate that

23  Channon High could not discuss with a former police officer of

24  hers that she went to the academy with about reports.  Perhaps

25  it was not a confidential report.  You know, at the end of the

1    day Channon denies ever speaking about Desiree Martinez

2    whatsoever or even knowing who she is.  But I understand that's

3    a credibility issue for the jury, and I think that she's

4    entitled to qualified immunity because it's unclear what right

5    that she's violated.

6            THE COURT:  Mr. Little, anything further you want to

7    add on this issue?

8            MR. LITTLE:  Not on this issue.  I would like to be

9    heard a little bit more on the qualified immunity issue if the

10   Court would indulge?

11           THE COURT:  Go ahead.

12           MR. LITTLE:  Your Honor, I'm citing from a case

13   decided by the Ninth Circuit yesterday.  It's entitled Morales

14   versus Fry.  The case number is 14-35991.  And that was an

15   excessive force case, and it deals with and discusses at length

16   the issue of qualified immunity.  And on page 12 of the slip

17   opinion it states, and I quote, in recent years the Court has

18   tightened the inquiry to focus closely on an analysis of

19   existing precedent.  In 2011 the Court clarified that while it

20   does not require a case directly on point, existing precedent

21   must have placed the statutory constitutional question beyond

22   debate such that every reasonable official, not just a

23   reasonable official, would have understood that he was

24   violating a clearly established right, and it's citing the

25   Ashcroft decision.

1        THE COURT:  Okay.

2        MR. LITTLE:  In later cases, the Court reiterated that

3   clearly established law should not be defined at a high level

4   of generality, and the dispositive question is whether the

5   violative nature of a particular in parenthesis -- I'm sorry,

6   in italics, conduct is clearly established citing to the

7   Mullenix case.  And this year in White versus Polly the Court

8   stated that barring a quote, unquote, obvious case under Graham

9   versus Connor or Tennessee versus Garner the clearly

10  established analysis in an excessive force context requires the

11  Court to, in italics, identify a case where the officer acting

12  under similar circumstances would have violated the 4th

13  Amendment.  My argument is this.

14       THE COURT:  That's almost identical language in the

15  other two cases I mentioned the, Isayeva, I-s-a-y-e-v-a, versus

16  the Sacramento Sheriff's Department, the October 2nd case from

17  the Ninth, and the Lopez versus Gelhaus and County of Sonoma

18  case that was filed on September 22nd, 2017, almost the same

19  exact language.

20     Go ahead.

21       MR. LITTLE:  I think the crucial point that has to be

22  recognized here is almost all of these cases that have now

23  very, very closely defined and required a specific case are all

24  in the excessive force context, and the reason is is that

25  there's no violation of a right in the excessive force context

1    unless the officer acted unreasonably.  It's not unreasonable

2    in the abstract to shoot someone or to use force on someone.

3    The nature of the excessive force right based on the Graham

4    test is defined based on the totality of the circumstances.

5         However, in a case such as this where we're not dealing

6    with excessive force, where we're dealing with a domestic

7    violence victim who is being -- having her substantive due

8    process rights denied or having her equal protection rights

9    denied, the same situation-by-situation reasonableness test

10   does not apply.  In this context, the level of abstraction has

11   to be somewhat more removed because the question is, to any

12   officer arriving on scene, can I -- it's not can I reasonably

13   deny services to a domestic violence victim based on her status

14   as a domestic -- that is not an inquiry that is even on the

15   radar of what we consider.

16        THE COURT:  You have to go back to 2013 though.  It

17   was different in 2013 than it is today.

18        MR. LITTLE:  Understood.

19        THE COURT:  And so in 2013 the problem with the

20   argument is it was less clear in 2013 as to how police officers

21   should act or needed to act.  And again, even as Mr. Smith

22   argued, even if you find these officers were grossly negligent

23   here, there is -- going back to that language, there's no

24   precedent in this 2013 time period that put these officers in a

25   domestic violence situation clearly on notice that what they

did and what they decided to do rose to the level of a

constitutional violation to a substantive due process

violation.  There's still the argument of whether there

actually was a substantive due process violation or not, and I

never really addressed that because it's just the second part

of the qualified immunity inquiry.  But again, I don't see any

clearly established precedent as of 2013 that would say to a

police officer, in these circumstances and these particular

police officers, the decisions you made in doing what you did

clearly violated, was a clear violation of Ms. Martinez's

substantive due process rights.  It may have been a violation

of policy.  It may have been a violation of state law.  But

you're talking about a claim in which she's accusing these

officers of violating her federal constitutional rights, and I

think that's the message the Supreme Court is trying to give to

district courts and appellate courts, and that is, there's got

to be more.  The police officers have to know, have to be

deliberately indifferent, have to in effect create a situation

like they did in Okin, laughing it up with the perpetrator,

joking, in effect telling him you can do what you want to do.

Don't worry about it, giving that message.

That's different than this case.  This case has a little

more -- it's a little more subtle, and I -- again I -- given

this recent spate of cases, even though they're mostly

excessive force cases, I agree with you.  I don't see any other

1    conclusion I can reach.  Admitting it's a close question, all

2    the arguments you're raising are valid arguments.  I just don't

3    see the Ninth Circuit or the Supreme Court at this point

4    agreeing that these officers were clearly on notice that what

5    they did was a clear violation of her substantive due process

6    rights.

7        It's -- you know, part of it is in thinking about this,

8    they didn't have the complete picture.  Obviously would have

9    been helpful if they had known there were numerous other

10   violations that this guy was doing this constantly, that the

11   abuse had been ongoing.  You know, if they had been the

12   officers that came out repeatedly, all those facts obviously

13   would have made it a different situation.  And unfortunately in

14   this case it's officers that came out once and responded to a

15   call.

16       And again, the argument against not finding qualified

17   immunity is that you're then -- you're then putting a police

18   officer in a position of damned if you do and damned if you

19   don't.  And again, the law on these types of claims is it's got

20   to be clear to the officer that what they're doing is --

21   clearly violates the plaintiff's constitutional rights.  It's a

22   difficult issue.  I understand all that.  But the trend right

23   now is towards granting qualified immunity in these situations

24   absent that clear precedent.

25       Okay.  Here's what I'm prepared to do with respect to all

these claims and let me go through them.  Again, as to the

Monell claims against the Cities of Clovis and Sanger, claim

number one the Court, as I've indicated, is granting summary

adjudication in favor of the cities.  There is no Monell

liability in this case.  There is no evidence to support the

argument that it was a policy that the cities created the

constitutional violations alleged in this case.

As to Officers Hershberger, Yambupah, and Sergeant Sanders,

they're named in the second claim of the complaint in this

case, a 1983 claim, the Court would grant summary adjudication

in favor of those three defendants on the grounds that those

defendants are entitled to qualified immunity under what I've

indicated is sometimes referred to as the clearly established

prong of the qualified immunity analysis.  What that prong

requires is that the right that was violated or alleged to have

been violated was clearly established at the time of the

incident.  Stated differently, qualified immunity attaches when

an official's conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person

would have known, and that's the language from the Supreme

Court case in White versus Polly.  For a right to be clearly

established, existing precedent must have placed the statutory

or constitutional question beyond debate.  In other words,

immunity protects all but the plainly incompetent or those who

knowingly violate the law, again language from the White case.

1    And again, while there are two prongs to the qualified

2    immunity analysis, the Court does have the discretion as to

3    which prong it wishes to address first.

4    As I've indicated, I believe the issue of whether federal

5    rights were clearly established, that's against the plaintiff

6    in this case.  The most factually analogous case which we've

7    discussed is the Okin versus Village of Cornwall on Hudson

8    Police Department case, a Second Circuit case.  But while being

9    factually analogous, it's not analogous enough.  It's not

10   sufficient, clear precedent to have placed these officers in

11   this situation on notice that their actions here would

12   constitute a clear violation of Ms. Martinez's constitutional

13   rights.

14   There were dispositive facts in Okin that the Second

15   Circuit relied on that aren't present here including an

16   open -- open camaraderie between the officers that responded to

17   the situation in Okin and the alleged abuser, that the officers

18   knew about the abuser's inability to stop the domestic violence

19   against Okin, numerous other factors that aren't present here.

20   No such evidence exists.

21   In this case I would be construing all disputes and all

22   facts in Ms. Martinez's favor including those to which she

23   testified in her deposition.  The officers' conduct does not

24   support Ms. Martinez's arguments that the officers were on

25   notice that their conduct implicated her substantive due

1    process rights.

2        Ms. Martinez has failed to identify a case where any of

3    these officers acting under similar circumstances was held to

4    have violated the 14th Amendment.  This is the inquiry that the

5    White case seems to require at this point in time.  Tamas,

6    Kennedy, Okin, do not support Ms. Martinez's arguments with

7    respect to the clearly established prong of qualified immunity.

8    The Court finds that in 2013 it was not clearly established

9    that a state-created danger cause of action could arise on

10   facts analogous to those present in this case, and therefore,

11   Officers Hershberger, Yambupah, and Sergeant Sanders were not

12   on notice of such.  And because the plaintiff has not met her

13   burden to show that this was clearly established law, these

14   three defendants are entitled to qualified immunity as to the

15   substantive due process claim contained in count 2.

16       There was an equal protection argument that's been raised

17   as well.  In that claim, which we didn't have a lot of

18   discussion about but again the Court in reviewing the arguments

19   and the case law, finds that again Ms. Martinez hasn't met her

20   burden with respect to the equal protection claim.  The issue

21   here is whether it was clearly established in 2013 that police

22   officers who don't arrest an alleged abuser, don't separate the

23   alleged abuser from the victim, don't offer domestic violence

24   victim information and services as required by state law are

25   administering police services in a discriminatory manner and

1    thereby violating the equal protection clause.

2        The Court finds again that Ms. Martinez has not met her

3    burden, that she has failed to identify a case where the

4    Supreme Court or the Ninth Circuit has recognized an equal

5    protection claim on facts remotely analogous to those here.

6    Even in Okin itself the Court actually denied the equal

7    protection argument in that case under the qualified immunity

8    discussion.

9        A number of other cases cited by Ms. Martinez including

10   Navarro versus Block, Fajardo, F-a-j-a-r-d-o, versus City of

11   Los Angeles, the Estate of Macias versus Ihde, I-h-d-e,

12   Balistreria versus Pacifica Police Department, all Ninth

13   Circuit cases.  Watson versus City of Kansas, a Tenth Circuit,

14   Bohen versus City of East Chicago, a Seventh Circuit case,

15   Thurman versus City of Torrington, District of Connecticut

16   case, Hawkins versus Town of Shaw, and again Okin, none of

17   those cases offer facts under similar circumstances where a

18   court has found or held that there was an equal protection

19   violation.

20       In short, Ms. Martinez's general statement that it's very

21   clear that an officer may violate the rights of domestic

22   violence victims either on the substantive due process or equal

23   protection theory defines the clearly established law at a,

24   quote, high level of generality that the Supreme Court rejected

25   in the White case.  As stated in White, to rule otherwise would

1    enable plaintiffs such as Ms. Martinez to convert the rule of

2    qualified immunity into a rule of virtually unqualified

3    liability simply by alleging violation of extreme abstract

4    rights.  Again, White counsel's against that, and therefore,

5    the Court finds that Officers Hershberger, Yambupah, and

6    Sergeant Sanders are entitled to qualified immunity.

7        As to Channon High, C-h-a-n-n-o-n, the Court denies the

8    motion for summary judgment as to Ms. High.  The Court finds

9    that there is genuine issues of material fact that need to be

10    resolved by way of trial as to the issue of whether she acted

11    under color of state law.

12        And in terms of qualified immunity, the Court finds that

13    under the facts most favorable to the plaintiff, that in 2013

14    it was clearly established that an officer sharing a domestic

15    violence victim's confidential information to the alleged

16    abuser would be a violation of the victim's substantive due

17    process rights because it would fall, in this case and in the

18    facts of this specific case, under the state-created danger

19    exception.  There are facts that give rise to inferences that

20    would allow the plaintiff to demonstrate to a jury that

21    Ms. High's actions here did in fact create a danger to her.

22        Okin again is a case which under these facts is similar and

23    would in effect put Ms. High on notice if in fact the plaintiff

24    can prove the allegations against her that Ms. High's acts

25    contributed to the vulnerability of a known victim, that she

1   engaged in conduct that embolden in this case the abuser, and

2   that that violated substantive due process clause.

3       Ms. Martinez did testify in her deposition that Ms. High

4   told Kyle Pennington about Ms. Martinez's police reports and

5   that consequently Ms. Martinez suffered additional abuse and

6   intimidation.  The Court finds that a reasonable officer, if

7   these facts are true, in Ms. High's position should have known

8   that her phone call would and could in embolden the alleged

9   abuser, Mr. Pennington, would embolden him to continue to abuse

10  Ms. Martinez, thus falling within the state-created danger

11  exception.  Therefore, the Court finds that Channon High would

12  not be entitled to qualified immunity on the substantive due

13  process theory.

14      On the equal protection theory, it was not clear that the

15  Court finds that an officer sharing one domestic violence

16  victim's confidential information to an alleged abuser violated

17  that victim's equal protection rights.

18      Ms. Martinez is not bringing and does not bring a

19  class-of-one claim.  She's therefore required to show that

20  Ms. High treated her as a domestic violence victim differently

21  than other similarly situated victims.  In this case she has

22  not done so.  First, there's no evidence of Channon High's

23  conduct in any other cases, so there is nothing for the Court

24  to compare her challenged conduct to.

25      Equally important, there is no evidence of a policy such as

1    the type of policy in Navarro versus Block of designating the

2    confidentiality of domestic violence victims' police reports as

3    lower priority or less important than the confidentiality of

4    other victim police reports.  Ms. Martinez's equal protection

5    theory is, the Court finds, an improper vehicle for challenging

6    Ms. High's conduct.  She has not shown that Ms. High treated

7    similarly situated victims differently, let alone that the

8    alleged violation was clearly established, and therefore,

9    Ms. High would be entitled to qualified immunity on the equal

10   protection theory, but the substantive due process theory will

11   go forward.

12        Okay.  If either counsel want to prepare an order

13   reflecting the Court's decisions, you may do so.  Just make

14   sure you agree on the form of the order.  If not, the

15   transcript and the Court's minute order will serve as the

16   Court's order in this case.  Do we have a trial date?

17             THE CLERK:  No.

18             THE COURT:  Or a pretrial conference?

19             THE CLERK:  No.

20             THE COURT:  Shall we set one?

21             THE CLERK:  Well, we could.  We could ask them to

22   submit a joint statement so we know when they're available.

23             THE COURT:  Good idea.  Submit a joint statement as to

24   when you want a pretrial conference and to take this to trial,

25   obviously in 2018.  You can conference with Mr. Vine.  He can

1    let you know what my schedule is like.  But do that, if you

2    can, within the next week or so so we can get this on the trial

3    calendar because 2018 is starting to fill up, okay?

4              MR. LITTLE:  Thank you, your Honor.

5              MR. SMITH:  Thank you, your Honor.

6              THE COURT:  I think there's another motion upcoming

7    soon.  Mr. Pennington wants to try to withdraw.

8              MR. LITTLE:  Yes.

9              THE COURT:  Okay.  When is that scheduled for?

10             MR. LITTLE:  I don't believe that it was noticed with

11   a hearing date.

12             THE CLERK:  There's no notice.  The attorney has been

13   advised to notice it.

14             THE COURT:  We've advised him to notice it for a

15   date.

16             THE CLERK:  Yeah.

17             THE COURT:  All right.  Thank you all.

18             MR. SMITH:  Thank you, your Honor.

19             MR. PHILLIPS:  Thank you, your Honor.

20                  (Proceedings adjourned, 10:10 a.m.)

21                            --oOo--

22   I certify that the foregoing is a correct transcript from the

23   record of proceedings in the above-entitled matter.

24                       /s/ Kacy Parker Barajas
                         _____
25                       KACY PARKER BARAJAS
                         CSR No. 10915, RMR, CRR, CRC