**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DESIREE MARTINEZ,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>CITY OF CLOVIS; SANGER CITY;<br>CHANNON HIGH; KYLE<br>PENNINGTON; KIM PENNINGTON;<br>CONNIE PENNINGTON; KRISTINA<br>HERSHBERGER; JESUS SANTILLAN;<br>ANGELA YAMBUPAH; RALPH<br>SALAZAR; FRED SANDERS,<br>*Defendants-Appellees*. | No. 17-17492<br><br>D.C. No.<br>1:15-cv-00683-JAM-<br>MJS<br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted January 15, 2019
San Francisco, California

Filed December 4, 2019

Before:  J. Clifford Wallace and Michelle T. Friedland,
Circuit Judges, and Robert S. Lasnik,* District Judge.

Opinion by Judge Lasnik

---

* The Honorable Robert S. Lasnik, United States District Judge for
the Western District of Washington, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's summary judgment in favor of law enforcement officers in an action brought pursuant to 42 U.S.C. § 1983 and state law by a victim of domestic abuse who alleged that defendants placed her at a greater risk of future abuse.

The panel held that the state-created danger doctrine under the Due Process Clause applies when an officer reveals a domestic violence complaint made in confidence to an abuser while simultaneously making disparaging comments about the victim in a manner that reasonably emboldens the abuser to continue abusing the victim with impunity. Similarly, the state-created danger doctrine applies when an officer praises an abuser in the abuser's presence after the abuser has been protected from arrest, in a manner that communicates to the abuser that the abuser may continue abusing the victim with impunity. Going forward, the panel held that the law in this circuit will be clearly established that such conduct is unconstitutional.

The panel held that the conduct of Officers Hershberger and Sanders violated plaintiff's constitutional right to due process, but that the officers were entitled to qualified immunity because it was not clear at the time that their conduct was unconstitutional. The panel held that Officer Yambupah's actions left plaintiff in the same position she would have been in had Yambupah not acted at all, and

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

therefore Yambupah's failure to protect plaintiff against private violence thus did not violate the Due Process Clause.

**COUNSEL**

Kevin G. Little (argued), Law Office of Kevin G. Little, Fresno, California, for Plaintiff-Appellant.

Diana L. Field (argued), Ferguson, Praet & Sherman, Santa Ana, California, for Defendants-Appellees Kristina Hershberger, Angela Yambupah, Fred Sanders, and Channon High.

John W. Phillips (argued), Patrick J. Gorman, and Kristina D. Garabedian, Wild, Carter & Tipton, Fresno, California, for Defendants-Appellees Kim Pennington and Connie Pennington.

No appearance for Defendants-Appellees City of Clovis, Sanger City, Kyle Pennington, Jesus Santillan, and Ralph Salazar.

## OPINION

LASNIK, District Judge:

Desiree Martinez is a victim of domestic violence. The issue before us is whether she can recover damages under 42 U.S.C. § 1983 from the law enforcement officers who allegedly placed her at greater risk of future abuse. In addition to suing her abuser, Kyle Pennington (a City of Clovis Police Department officer), she asserts claims under § 1983 against the City of Clovis ("Clovis"), the City of Sanger ("Sanger"), and six police officers, as well as negligence claims against Pennington's parents, Connie and Kim Pennington. She appeals from the district court's summary judgment in favor of Officer Kristina Hershberger, Officer Angela Yambupah, Sergeant Fred Sanders, and Kim and Connie Pennington.[1]

We hold that Hershberger's and Sanders's conduct violated Martinez's constitutional right to due process. We also hold that the officers are entitled to qualified immunity because it was not clear at the time that their conduct was unconstitutional. We therefore affirm the district court's summary judgment.

## I.   BACKGROUND

Martinez and Pennington started living together in 2013 with Martinez's daughter, Destiny, in Clovis. Pennington first physically and sexually abused Martinez in April 2013,

---

[1] Martinez's appeal from the district court's summary judgment of her claim against Kim and Connie Pennington is addressed in a concurrently filed memorandum disposition.

while the two were staying at a hotel in Dublin, California.[2] After that, a pattern of violence ensued. Martinez's § 1983 claims against Clovis, Sanger, and the individual officers arise out of two incidents that took place on May 2, 2013, and June 4, 2013. We address these two incidents in turn.

## A.  May 2, 2013, Incident

Martinez was at her cousin's house on the evening of May 2, 2013. When Pennington arrived at the house, he became physically abusive. Pretending to leave, Martinez exited the house and hid outside. After Pennington left, she dialed 911 and took a taxi to the house where she lived with Pennington. Hershberger and Jesus Santillan were dispatched to the home. The officers were onsite when Martinez arrived.

Pennington walked over to the taxi and warned her not to say anything to the officers. Martinez told Hershberger that she did not want to speak to Santillan because he was Pennington's friend. Hershberger then spoke with Martinez outside of Pennington's immediate presence. According to Martinez, however, Pennington was still within eye and earshot.

Hershberger testified that Martinez had told her about Pennington's physical abuse in Dublin but did not mention that Pennington had been physically abusive that evening. Hershberger tried to probe further, but Martinez asked to go inside, insisting that she was fine. Martinez gave inconsistent

---

[2] In reviewing the district court's summary judgment, we adopt Martinez's version of the facts. *See Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 989 (9th Cir. 2016) (en banc) (citation omitted).

6                 MARTINEZ V. CITY OF CLOVIS

testimony about whether she told Hershberger that Pennington had pushed her down the stairs that evening, ultimately clarifying that she had. She claimed that Hershberger asked her to "hold on just a second" and moved away. Pennington stared at Martinez in a manner she perceived as intimidating, so she walked toward him, "because [she] didn't want him to think that [she] was talking to the officer."

While Martinez was standing in front of Pennington, Hershberger returned. She had a tape recorder and asked Martinez to repeat her statements about what had happened in Dublin. Martinez testified that "[a]t that point [she] was scared because [Hershberger] had said Dublin and she had said it in front of [Pennington], so [Martinez] told her, 'Nothing, nothing happened.'" Martinez heard Pennington clear his throat, which she contends he does when he is angry, and therefore "acted like [she] didn't know what . . . she was talking about."[3]

Hershberger had received domestic violence training. She believed that Martinez faced potential risk if she stayed with Pennington that night. She was aware that domestic violence victims "might tend to recant accusations of violence" out of fear of reprisal.

---

[3] Martinez had been drinking that evening. Hershberger testified that Martinez was "highly intoxicated." However, Martinez testified that she only pretended to be intoxicated because she was afraid of Pennington and did not want him to know that she had told Hershberger about what had happened in Dublin.

However, she did not arrest Pennington. She did not advise Martinez of her right to make a citizen's arrest,[4] her right to obtain a restraining order, or the possibility of staying at a shelter.[5] She did not provide Martinez with Clovis's pamphlet for victims of domestic violence. She contends that this was because Martinez did not indicate that any violence had occurred that evening, and because she was responding to a "check the welfare" call, not a domestic violence call. Instead, she recommended that Martinez be contacted and interviewed again.

Hershberger and Pennington had both worked with the Clovis Police Department ("Clovis PD") for about nine years. Hershberger did not socialize with Pennington and had only a "neutral" opinion of him. Pennington testified that after Martinez went back inside the house, Hershberger spoke with him briefly. As Pennington describes it, she "was asking me, you know, what I was doing dating a girl like Desiree Martinez and what was going on, what was going on

---

[4] Section 836(b) of the California Penal Code states that "[a]ny time a peace officer is called out on a domestic violence call, it shall be mandatory that the officer make a good faith effort to inform the victim of his or her right to make a citizen's arrest . . . This information shall include advising the victim how to safely execute the arrest." Cal. Penal Code § 836(b). Similar provisions are included in Section 320.3.4 of the Clovis Manual.

[5] Section 320.6 of the Clovis Manual lays out suggested methods of assisting a victim, including "[a]ssist[ing] in arranging to transport the victim to an alternate shelter if the victim expresses a concern for their safety, or the officer determines a need exists," and "[e]xplain[ing] legal options available to the victim including the private person's arrest process, [and] temporary restraining and stay-away orders." Hershberger testified that she asked Martinez if there was somewhere else that she could go, but Martinez insisted on staying and said that she was not scared.

in my life because I was recently divorced and, you know, that she didn't think that she was necessarily a good fit for me."

That night, Pennington physically abused Martinez. He called her a "leaky faucet" and asked her what she had told Hershberger and whether she was trying to get him in trouble. The next day, Martinez spoke with a detective over the phone. Pennington had scripted the conversation, and Martinez denied everything that she had said to Hershberger.

In May 2013, Martinez contacted members of the Clovis PD again about an incident unrelated to this appeal. To avoid further investigation by the Clovis PD, Martinez and Pennington moved to Sanger at the end of the month.

## B.  June 4, 2013, Incident

On the night of June 3, 2013, Pennington physically and sexually abused Martinez. Martinez stated that he choked, beat, suffocated, and sexually assaulted her. Martinez did not have access to a phone, but one of their neighbors made a 911 domestic violence call. Yambupah and Sanders arrived at the house with two other officers. When the officers arrived, both Martinez and Pennington were standing outside of the house.

Yambupah had received domestic violence training. She noticed that Martinez had injuries consistent with those of a victim of physical abuse, including a red cheek, scrapes on her knees, a manicured fingernail that was broken and bleeding, a torn shirt, and bruising on her arms. She photographed Martinez's injuries. Although Yambupah later acknowledged that separating Martinez and Pennington was important because of the possibility of intimidation, Martinez testified that they were not separated by more than

seven feet when she and Yambupah spoke. Martinez, believing that Pennington was within earshot, whispered to Yambupah that the injuries had been inflicted by Pennington, that Pennington had tried to smother her with a pillow, and that he had attempted to choke her.

Yambupah believed that she had probable cause to arrest Pennington and determined that he was the dominant aggressor.[6] She believed that this made Pennington's arrest mandatory under California Penal Code § 836(c)(1).[7] She also believed that as a police officer, Pennington had access to weapons. Yambupah learned from Martinez that Pennington was on administrative leave from the Clovis PD because of a domestic violence incident with an ex-girlfriend.

Yambupah told Martinez that she was going to make an arrest, and "huddled" with the other officers. When Yambupah informed them of Martinez's allegations and Pennington's position with the Clovis PD, Sanders, who was

---

[6] The Sanger Police Department's Policy Manual ("Sanger Manual") states that "[t]he dominant aggressor is the person who has been determined to be the most significant, rather than the first, aggressor." *See* Cal. Penal Code § 13701(b).

[7] It is not clear that the arrest was mandatory. The California Penal Code establishes the circumstances under which a peace officer *may* arrest a suspect for assault or battery upon a cohabitant. *See* Cal. Penal Code § 836(d). It also states that an arrest is mandatory under certain circumstances when a peace officer is responding to a call alleging a violation of a domestic violence protective or restraining order. *See id.* at § 836(c). But there does not appear to have been a protective or restraining order in place at that time against Pennington. More guidelines for making an arrest are included in Section 320.9.1 of the Sanger Manual.

acting as a supervisor on the scene, ordered her to refer the matter to the District Attorney instead of making an arrest.[8] Yambupah testified that had Sanders not given the order, she would have arrested Pennington on that day "in the interest of Ms. Martinez's safety."

The officers did not give Martinez the jurisdiction's domestic violence information handout,[9] did not inform her of her right to effect a citizen's arrest,[10] did not offer her transportation to a shelter, and did not issue an emergency protective order.[11] Yambupah testified that she did not give Martinez the handout because she did not want to leave her side. She "asked Martinez to let [her] help her," but Martinez refused. She did not issue a protective order because Martinez "was not willing to pursue any assistance from [her] at all." She foresaw a risk of continued violence, which

---

[8] Sanders was not deposed in this matter; after these events took place, it came to light that he has dementia. He is now in a treatment facility.

[9] Section 320.5(b) of the Sanger Manual states that officers should "[p]rovide the victim with the department's domestic violence information handout, even if the incident may not rise to the level of a crime."

[10] Section 320.9.1(b) of the Sanger Manual states that "[a]n officer responding to a domestic violence call who cannot make an arrest will advise the victim of his/her right to make a private person's arrest. The advisement should be made out of the presence of a suspect and shall include advising the victim how to safely execute the arrest."

[11] Section 320.5(c) of the Sanger Manual states that "[o]fficers should . . . [a]lert the victim to any available victim advocates, shelters and community resources." Restraining order rights were detailed on the Sanger Police Department's ("Sanger PD") domestic violence information handout.

she attempted, unsuccessfully, to address by verifying that
Pennington was going to leave.

Yambupah did not know that Pennington was an officer
with the Clovis PD until Martinez informed her that he was.
Pennington testified that he knew of Sanders, but that they
were not friends. Pennington's father, Kim, and Sanders had
known each other for at least 25 years. On leaving, Sanders
said that the Penningtons were "good people."

After the officers left, Martinez was again beaten and
sexually assaulted by Pennington. He was arrested the next
day, and a criminal protective order was issued.

Martinez continued to live with Pennington after his
arrest on June 5, 2013. He physically and sexually abused
her multiple times between July and September 2013, when
she finally moved out. Pennington was eventually convicted
of multiple counts of violating the criminal protective order.
He also pled guilty to one domestic violence charge.

## C.  Procedural History

Martinez sued Pennington, the cities of Clovis and
Sanger, Officers Hershberger, Santillan, High, Yambupah
and Salazar, Sergeant Sanders, and Kim and Connie
Pennington. She asserted claims under 42 U.S.C. § 1983 of
municipal liability in denial of substantive due process and
equal protection against Clovis and Sanger, and of individual

liability against Hershberger, Santillan, Salazar,[12] High,[13] Yambupah, and Sanders. In her claims against the officer defendants, Martinez contends the officer defendants violated her right to due process under the state-created danger doctrine.[14]

The cities and officer defendants moved for summary judgment on August 15, 2017. The district court granted summary judgment on all claims against the cities of Sanger and Clovis, as well as Hershberger, Yambupah, and Sanders. Partial judgment was issued. Martinez timely appealed.

## II.   STANDARD OF REVIEW

We review *de novo* a district court's summary judgment. *See Animal Legal Def. Fund*, 836 F.3d at 988 (citation omitted). In doing so, we view the evidence in the light most favorable to the nonmoving party. *See id.* at 989 (citing *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir.

---

[12] In June 2017, the parties agreed to dismiss Martinez's claims against Santillan and Salazar.

[13] Martinez alleged that High, an officer with the Clovis PD, contacted Pennington and disclosed the confidential victim reports that Martinez had made. She was physically and sexually abused by Pennington as a result of that disclosure. The district court denied High's motion for summary judgment on the substantive due process claim, holding that qualified immunity did not apply. The claims against High are not before us.

[14] Specifically, she alleged that "[w]hile there is no affirmative constitutional duty to protect a citizen from third party violence, when a state actor becomes involved and through her intentional actions worsens the citizen's situation and creates a danger worse or in addition to those faced by the citizen, that state actor has violated the citizen's substantive due process rights."

2004)). In "qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). We also review *de novo* a district court's determination on qualified immunity. *See Robinson v. Prunty*, 249 F.3d 862, 865–66 (9th Cir. 2001) (citing *Hamilton v. Endell*, 981 F.2d 1062, 1065 (9th Cir. 1992)).

### III.    QUALIFIED IMMUNITY DOCTRINE

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In evaluating whether an officer is entitled to qualified immunity, courts consider (1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of the incident. *See Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Pearson*, 555 U.S. at 223). Qualified immunity applies either where there was no constitutional violation or where the constitutional violation was not clearly established. *See id.* We have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

The Supreme Court has "warned against beginning with the first prong of the qualified-immunity analysis when it would unnecessarily wade into 'difficult questions' of constitutional interpretation that have no effect on the outcome of the case.'" *Sjurset v. Button*, 810 F.3d 609, 615 (9th Cir. 2015) (quoting *Pearson*, 555 U.S. at 236–37). But

the Supreme Court has also recognized that the two-step qualified immunity procedure "is intended to further the development of constitutional precedent." *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019) (quoting *Pearson*, 555 U.S. at 237). Even in difficult cases, our court tends "to address both prongs of qualified immunity where the 'two-step procedure promotes the development of constitutional precedent' in an area where this court's guidance is . . . needed.'" *Id.* (quoting *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc)). Because guidance is necessary to promote the development of constitutional precedent in this area, we elect to begin with the first part of the qualified immunity inquiry.

## IV.   VIOLATION OF MARTINEZ'S CONSTITUTIONAL RIGHT

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Because Martinez alleges that the individual officers deprived her of liberty by affirmatively placing her at greater risk of abuse, Martinez's claims are rooted in the substantive component of the Due Process Clause. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 194–95 (1989).

The Due Process Clause is a limitation on state action and is not a "guarantee of certain minimal levels of safety and security." *Id.* at 195. Simply failing to prevent acts of a private party is insufficient to establish liability. *See Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). "The general rule is that a state is not liable for its omissions" and the Due Process Clause does not "impose a duty on the state to protect individuals from third parties." *Id.* (alterations omitted) (first quoting *Munger v. City of Glasgow Police*

*Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000), then quoting *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007)).

There are two exceptions to this general rule. First, a special relationship between the plaintiff and the state may give rise to a constitutional duty to protect. *See DeShaney*, 489 U.S. at 198–202.[15] Second, the state may be constitutionally required to protect a plaintiff that it "affirmatively places . . . in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *Patel*, 648 F.3d at 971–72 (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)); *see also Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006) (holding that the officer "affirmatively created a danger to [the plaintiff] she otherwise would not have faced" by informing her assailant of the accusations her family had made against him before they "had the opportunity to protect themselves from his violent response to the news . . . [thus] creat[ing] 'an opportunity for [him] to assault [the plaintiff] that otherwise would not have existed'" (alterations omitted) (quoting *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992))).

Martinez argues that the state-created danger doctrine applies because Hershberger, Yambupah, and Sanders affirmatively exposed her to a greater risk of a known danger. To succeed on this claim, Martinez must establish three elements. First, she must show that the officers' affirmative actions created or exposed her to an actual, particularized danger that she would not otherwise have faced. Second, she must show that the injury she suffered

---

[15] Martinez passingly references a special relationship between herself and the police officers, but does not advance the argument and did not allege it in her complaint. We therefore only address the state-created danger exception.

was foreseeable. Third, she must show that the officers were deliberately indifferent to the known danger. *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018). We analyze these elements and the officers' conduct below.

## A. Actual, Particularized Danger

Martinez must first show that the officers affirmatively exposed her to "an actual, particularized danger." *Id.* (citing *Kennedy*, 439 F.3d at 1063). We do "not look solely to the agency of the individual . . . or what options may or may not have been available to her." *Id.* (alterations omitted) (quoting *Munger*, 227 F.3d at 1086). Instead, we consider "whether the officers left the person in a situation that was more dangerous than the one in which they found" her. *Id.* (quoting *Munger*, 227 F.3d at 1086).

Whether the danger already existed is not dispositive because, "by its very nature, the doctrine only applies in situations in which the plaintiff was directly harmed *by a third party*—a danger that, in every case, could be said to have 'already existed.'" *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012) (emphasis in original). The relevant question is whether "state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy*, 439 F.3d at 1061 (citations and footnote call number omitted).

### 1. *Officer Hershberger*

Martinez argues that Officer Hershberger placed her in greater danger by failing to inform her of her rights or options, failing to provide her with the Clovis PD's handout for domestic violence victims, and failing to make an arrest.

Although these failures may have been a dereliction of Hershberger's duties, they were not "an affirmative act [that] create[d] an actual, particularized danger." *Hernandez*, 897 F.3d at 1133 (citing *Kennedy*, 439 F.3d at 1063). In other words, Hershberger did not make the situation worse for Martinez. Hershberger simply left Martinez in the same position she was in before the police had arrived.

Martinez also maintains that Hershberger failed to separate her from Pennington, causing her to recant her allegations of abuse out of fear of Pennington. But this alleged failure did not expose Martinez to a danger that she would not otherwise have faced. *See Henry A.*, 678 F.3d at 1003. Failing to affirmatively separate Martinez from Pennington left her in the same position she would have been in had Hershberger not responded to the 911 call. At least under these circumstances, Hershberger did not violate Martinez's right to due process.

However, the record also reveals that Hershberger told Pennington about Martinez's testimony relating to his prior abuse, and also stated that Martinez was not "the right girl" for him. A reasonable jury could find that Hershberger's disclosure provoked Pennington, and that her disparaging comments emboldened Pennington to believe that he could further abuse Martinez, including by retaliating against her for her testimony, with impunity. The causal link between Hershberger's affirmative conduct and the abuse Martinez suffered that night is supported by Martinez's testimony that Pennington asked Martinez what she had told the officer while he was hitting her.

That Martinez was already in danger from Pennington does not obviate a state-created danger when the state actor enhanced the risks. *See Hernandez*, 897 F.3d at 1135 (explaining that an officer cannot avoid liability merely

because the plaintiff had already been in a dangerous situation before contact with the officer). Because a reasonable jury could infer that Martinez was placed in greater danger after Hershberger disclosed Martinez's complaint and made comments to Pennington that conveyed contempt for Martinez, the first requirement of the state-created danger doctrine is satisfied.

### 2. *Officer Yambupah*

Officer Yambupah failed to separate Martinez from Pennington when conducting the interview, did not arrest Pennington despite Martinez's complaints of abuse,[16] did not provide Martinez with information that may have allowed her to escape further abuse, and did not issue an emergency protective order. These were not "affirmative acts[s] [that] create[d] an actual, particularized danger." *Id.* at 1133 (citing *Kennedy*, 439 F.3d at 1063). Martinez was left in the same position she would have been in had Yambupah not acted at all. *See Henry A.*, 678 F.3d at 1003. Yambupah's failure to protect Martinez against private violence thus did not violate the Due Process Clause. *See DeShaney*, 489 U.S. at 196.

### 3. *Sergeant Sanders*

Several of Martinez's allegations against Sergeant Sanders mirror those against Yambupah. With respect to Martinez's claims that Sanders did not separate her from Pennington, provide her with information, or issue an emergency protective order, we conclude that Sanders's

---

[16] Yambupah failed to arrest Pennington because she was ordered not to do so by Sanders. This is discussed below as part of Sanders's conduct.

conduct, like Yambupah's, does not support a § 1983 claim. But, in other respects, Sanders's conduct materially differed from Yambupah's.

Knowing that Pennington was an officer with the Clovis PD, Sanders ordered Yambupah not to arrest Pennington. This decision, on its own, did not leave Martinez in a more dangerous situation than the one in which he found her, and thus was not itself unconstitutional. *See Hernandez*, 897 F.3d at 1133; *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) (holding that "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause").

But the record contains evidence of more than just Sanders's order not to arrest Pennington. In instructing Yambupah not to arrest Pennington, which he did in Pennington's presence, Sanders also expressed that the Penningtons were "good people."[17] Sanders spoke positively about the Penningtons against the backdrop that everyone involved, including Sanders, knew that Pennington and his father were police officers. While hearing Sanders speak

---

[17] While Martinez did not expressly testify that Sanders was the officer who had said that the Penningtons were "good people," the context supports the inference that Martinez's testimony pertains to Sanders. Pennington testified that he did not hear the "good people" comment. However, Martinez testified that Pennington was within earshot when Sanders ordered Yambupah not to arrest Pennington. She also characterized the "good people" comment as Sanders's final comment before leaving. Viewing the evidence in the light most favorable to Martinez, a jury could infer that Pennington heard both Sanders's order not to arrest and heard Sanders say that the Penningtons were "good people."

positively about the Penningtons, Martinez also "heard Sanders telling [Yambupah] that, you know, 'We're not going to arrest him. We're just going to turn it over to Clovis PD,' whatever." (emphasis added).

Viewing the record in the light most favorable to Martinez, a jury could reasonably find that Sanders's positive remarks about the Penningtons placed Martinez in greater danger. The positive remarks were communicated against the backdrop that Sanders knew that Pennington was an officer and that there was probable cause to arrest[18]— which the jury could infer Pennington, as a police officer, understood. A reasonable jury could find that Pennington felt emboldened to continue his abuse with impunity. In fact, the following day, Pennington abused Martinez yet again. Under these circumstances, the first requirement of the state-created danger doctrine is satisfied.

## B. Foreseeability

To invoke the state-created danger doctrine, Martinez must next show that her "ultimate injury" was "foreseeable." *Hernandez*, 897 F.3d at 1133 (citing *Lawrence v. United States*, 340 F.3d 952, 957 (9th Cir. 2003)). This does not mean that the exact injury must be foreseeable. Rather, "the state actor is liable for creating the foreseeable danger of injury given the particular circumstances." *Kennedy*, 439 F.3d at 1064 n.5.

As a matter of common sense, the assaults Martinez suffered after the police interventions on May 2, 2013, and June 4, 2013, were objectively foreseeable. *See Hernandez*,

---

[18] Again, that there was probable cause to arrest and no arrest was made is not the basis for the constitutional violation.

897 F.3d at 1133 (citing *Lawrence*, 340 F.3d at 957); *Grubbs*, 974 F.2d at 121 (concluding a § 1983 claim was viable when state employees "knowingly assigned [the plaintiff] to work with [an inmate] despite their knowledge" of his history of violence toward women, the likelihood that she would be left alone with him, and the fact that she would not be prepared to defend against or avert an attack); *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989) (stating "the inherent danger facing a woman left alone at night in an unsafe area is a matter of common sense") (citation omitted).

## C. Deliberate Indifference to a Known Danger

Under the state-created danger test, Martinez must finally show that the officers acted "with 'deliberate indifference' to a 'known or obvious danger.'" *Hernandez*, 897 F.3d at 1133 (quoting *Patel*, 648 F.3d at 974). This is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Patel*, 648 F.3d at 974 (quoting *Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). The standard is higher than gross negligence, because it requires a "culpable mental state." *Id.* (citing *Grubbs*, 92 F.3d at 898–900).

"The state actor must 'recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff.'" *Id.* (alterations omitted) (quoting *Grubbs*, 92 F.3d at 899). In other words, the state actor must have known that something was going to happen, but "ignored the risk and exposed the [plaintiff] to it anyway." *Hernandez*, 897 F.3d at 1135 (alterations omitted) (quoting *Patel*, 648 F.3d at 974).

Given the foreseeability of future domestic abuse here, a reasonable jury could find that disclosing a report of abuse while engaging in disparaging small talk with Pennington,

and/or positively remarking on his family while ordering other officers not to make an arrest despite the presence of probable cause, constitutes deliberate indifference to a known or obvious danger. *See Hernandez*, 897 F.3d at 1136. That Pennington was already under investigation by the Clovis PD for allegations of abuse against an ex-girlfriend also suggests that future abuse was a known or obvious danger. By ignoring the risk created by Pennington's violent tendencies, the officers acted with deliberate indifference toward the risk of future abuse.

We hold that a reasonable jury could find that Hershberger and Sanders violated Martinez's due process right to liberty by affirmatively increasing the known and obvious danger Martinez faced.

## V.   CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT

We next turn to the question whether, at the time of the challenged conduct, the law was sufficiently well defined that every reasonable officer in the officers' shoes would have known that their conduct violated Martinez's right to due process. We conclude it was not. Qualified immunity therefore applies.

"Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson*, 555 U.S. at

231). The plaintiff bears the burden of proving that "the right allegedly violated was clearly established at the time of the alleged misconduct." *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) (citing *Baker v. Racansky*, 887 F.2d 183, 186 (9th Cir. 1989)).

"'[C]learly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, it "must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) (citing *al-Kidd*, 563 U.S. at 741).

There need not be a case directly on point for a right to be clearly established. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citing *White*, 137 S. Ct. at 551); *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) ("[W]e do not require a case to be 'on all fours' . . . ." (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001))), *cert. denied sub nom. Shafer v. Padilla*, 138 S. Ct. 2582 (2018). But existing precedent "must have placed the statutory or constitutional question beyond debate." *Shafer*, 868 F.3d at 1117 (quoting *White*, 137 S. Ct. at 551). In other words, "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *White*, 137 S. Ct. at 551). To deny immunity, we must conclude that every reasonable official would have understood, beyond debate, that the conduct was a violation of a constitutional right. *Id.* at 1118 (citing *Mattos*, 661 F.3d at 448).

We begin by looking to binding precedent from the Supreme Court or our court. *See Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014) (citing *Boyd v. Benton Cty.*, 374 F.3d 773, 781 (9th Cir. 2004)). Without binding precedent, "we look to whatever decisional law is available . . . including decisions of state courts, other circuits, and district courts." *Id.* (alterations in original) (quoting *Boyd*, 374 F. 3d at 781). The precedent must be "'controlling'— from the Ninth Circuit or the Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

Martinez and the district court identified a Second Circuit decision, *Okin v. Village of Cornwall-on-Hudson Police Department*, 577 F.3d 415 (2d Cir. 2009), as being factually similar to this case. There, Michele Okin and Roy Charles Sears lived together. *See id.* at 419–20. Sears began physically abusing Okin in 2001. *See id.* at 420.

Over the 15-month period of domestic violence, one incident was most similar to the situation here. On December 23, 2001, Sears relayed to Okin that he had told the village police chief that he could not "help it sometimes when he smack[ed] Michelle Okin around." *Id.* Okin attempted to call the police, and Sears started to choke her. *See id.* She eventually called 911. *See id.*

When the police officers arrived, she told them what had happened and showed them what appeared to be old bruises on her legs. *See id.* She also said that Sears had thrown a bottle at her that day. *See id.* at 421. She asked them to "tell [Sears] to stop beating [her]." *Id.* at 420. One of the officers testified that he did not arrest Sears despite Okin's statements or his observations because there was no recent

injury. *See id.* at 420–21. Okin eventually indicated she wanted to press charges. *See id.* at 421. The officers began to advise her of how to do so when she walked away, joined Sears, and returned stating that she did not want to press charges. *See id.* at 421. Okin testified that the reason she had walked away was that the officers were "derogatory" toward her. *Id.* She also said that, "to the extent that the officers talked with Sears, it was about football." *Id.* A little over a week later, she called the police again to report that Sears was beating her. *See id.*

Okin filed a § 1983 action, alleging that because Sears witnessed the officers' dismissive attitude toward the abuse, the "danger she faced" had "affirmatively increased." *Id.* at 426. For example, by discussing sports with her abuser, the officers "gave official sanction" to the abuse and "affirmatively contributed to her vulnerability." *Id.* at 427.

The Second Circuit concluded that a "reasonable factfinder undoubtedly could conclude that defendants, by their affirmative conduct, enhanced the danger to Okin because they conveyed to Sears that he could continue to engage in domestic violence with impunity, and that defendants thus violated Okin's due process rights." *Id.* at 430–31.

Without binding precedent from our court or the Supreme Court, we may look to decisions from the other circuits. *See Tarabochia*, 766 F.3d at 1125 (citing *Boyd*, 374 F.3d at 781). But we cannot rely on *Okin*, because it has not been "embraced by a 'consensus' of courts." *Sharp*, 871 F.3d at 911 (quoting *Wilson*, 526 U.S. at 617). Notably, the Seventh Circuit has stated that *Okin* may be "in tension with" *DeShaney* and the Supreme Court's decision in *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005). *Wilson-Trattner v. Campbell*, 863 F.3d 589, 595 (7th Cir. 2017). In

light of this muddled legal terrain, we cannot hold that "every reasonable official would have understood . . . beyond debate," that the officers' conduct here violated Martinez's right to due process. *Shafer*, 868 F.3d at 1118 (alteration in original) (quoting *Mattos*, 661 F.3d at 448).

Hershberger and Sanders are entitled to qualified immunity because the due process right conferred in the context before us was not clearly established. Although the application of the state-created danger doctrine to this context was not apparent to every reasonable officer at the time the conduct occurred, we now establish the contours of the due process protections afforded victims of domestic violence in situations like this one. *See Thompson v. Rahr*, 885 F.3d 582, 590 (9th Cir. 2018). Significantly, "it is the facts" of this case "that clearly establish what the law is" going forward. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 951 (9th Cir. 2017) (citation omitted).

We hold today that the state-created danger doctrine applies when an officer reveals a domestic violence complaint made in confidence to an abuser while simultaneously making disparaging comments about the victim in a manner that reasonably emboldens the abuser to continue abusing the victim with impunity. Similarly, we hold that the state-created danger doctrine applies when an officer praises an abuser in the abuser's presence after the abuser has been protected from arrest, in a manner that communicates to the abuser that the abuser may continue abusing the victim with impunity.[19] Going forward, the law

---

[19] Although the failure to arrest does not itself give rise to a state-created danger, it may, as here, inform the "manner" in which an officer's positive remarks "communicates to the abuser that the abuser may continue abusing the victim with impunity."

in this circuit will be clearly established that such conduct is unconstitutional.

## VI.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's summary judgment in favor of Hershberger, Yambupah, and Sanders.